**NATIONAL WILDLIFE FEDERATION,**
Appellant,

v.

**Douglas M. COSTLE, in His Official Capacity as Administrator, Environmental Protection Agency, et al.**

(Ocean Dumping)

No. 78–2167.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 2, 1979.

Decided July 2, 1980.

As Amended on Denial of Rehearing
Aug. 15, 1980.

As Amended Oct. 22, 1980.

Kenneth S. Kamlet, Washington, D. C., for appellant.

Rebecca A. Donnellan, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Bruce C. Rashkow and Michael W. Reed, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Joseph E. LeBlanc, Jr., New Orleans, La., was on brief for amicus curiae American Association of Port Authorities.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and MacKINNON, Circuit Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

Appellant National Wildlife Federation (NWF) appeals from the District Court's entry of summary judgment and dismissal of its challenge to certain revised regulations and criteria promulgated by the Administrator of the Environmental Protection Agency (EPA) pursuant to the Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA or Ocean Dumping Act), 33 U.S.C. §§ 1401–1444 (1976). The revised regulations and criteria regulate dumping of waste materials in the ocean. In particular, they establish the procedures by which parties may apply for permits to dump dredged and nondredged wastes in the ocean and the criteria by which such applications are to be evaluated by the Army Corps of Engineers (Corps) and the Administrator, respectively.

NWF objects to the revised regulations and criteria on the ground that they establish different, and generally less stringent, restrictions for dredged wastes than for nondredged materials. NWF argues that this more relaxed regulation of dredged wastes is unlawful for three reasons. It contends that the Ocean Dumping Act[1] requires that certain evaluation factors be applied to applications for permits to dump all waste materials, and that the less stringent requirements for dredged materials unlawfully omit certain mandatory evaluation factors. It also argues that the Ocean Dumping Act requires that dredged and nondredged materials be treated alike and that their different treatment in the revised regulations and criteria runs afoul of this "equivalence requirement." Finally, NWF asserts that the distinction drawn between the two types of wastes is arbitrary and

capricious and without any basis or justification in the record. NWF also challenges the Administrator's designation of 140 ocean disposal sites prior to completion of studies of the characteristics of the dumping sites and without consideration of all of the evaluative criteria contained in the Ocean Dumping Act.

In response the Government disagrees with NWF's assertion that the factors contained in the Ocean Dumping Act must be included in the criteria as promulgated by the Administrator. It argues that the factors need only be considered by the Administrator in establishing the criteria; he is free to leave out a specific factor if, after consideration of that factor, he concludes that it need not or should not be applied to certain types of wastes. The Government also disputes NWF's assertion that the Ocean Dumping Act requires that dredged and nondredged materials be treated identically. Finally, the Government contends that the Ocean Dumping Act does not prohibit interim designation of ocean dumping sites pending completion of site studies.

We think the District Court erred in granting summary judgment against NWF, at least as to the five counts on which NWF takes this appeal. Accordingly, we vacate the District Court's judgment and remand the case for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

### A. The Ocean Dumping Act

Concerned over the related ecological, health, and economic implications of continued unregulated dumping of waste materials into the oceans, Congress enacted the

---

1. Both before the District Court and before this court on appeal, NWF has pleaded its reliance upon both the Ocean Dumping Act and the Convention on the Dumping of Wastes at Sea (the Convention), 26 U.S.T. 2403, T.I.A.S. No. 8165. NWF has made it clear, however, that it does not regard the Convention as having any independent effect upon domestic law. Rather, it views the Administrator's obligations as being derived solely from the Ocean Dumping Act, which incorporates by reference the substantive provisions of the Convention to the extent those provisions do not impose a lesser standard than does the statute itself. See appellant's brief at 20 n.*. Accordingly, we will refer solely to the requirements of the Ocean Dumping Act without distinguishing, except

Ocean Dumping Act in 1972.[2] Section 101 of the Act[3] prohibits, unless authorized by permit,[4] (1) transportation from the United States of waste materials for the purpose of dumping the wastes in the ocean, and (2) dumping of waste materials into the territorial seas of the United States or into contiguous waters.[5] The Corps is authorized to issue permits with respect to dredged wastes only,[6] and the EPA Administrator has permit authority for all other wastes.[7]

The Ocean Dumping Act directs the Administrator to promulgate criteria to be used by both the Administrator and the Corps in reviewing and evaluating permit applications. The statute provides that the Administrator, "in establishing or revising such criteria, shall consider, but not be limited in his consideration to," [8] nine broadly defined factors. These include: the need for dumping; the effect of ocean dumping on human health and welfare, fisheries, and marine ecosystems; the appropriate locations and methods for ocean dumping of various wastes; and the existence of alternative locations and methods for waste disposal. The Administrator is also authorized to designate recommended sites for dumping and sites where no dumping would be allowed.[9]

The Act specifies in some detail the contents of permits issued by the Administrator and the Corps. It requires that all permits indicate the types and amount of wastes authorized to be dumped, the location of such dumping, the length of time for which the permits would be valid, and any other special conditions deemed necessary or appropriate with respect to, *inter alia*, monitoring and surveillance of the permittees' transporting and dumping of wastes.[10] The Act also requires the Administrator and the Corps to review periodically all permits and, after notice and opportunity for a hearing, to revise or revoke any permit where continued dumping in accordance with the permit's conditions would be inconsistent with the criteria and other factors required to be considered by the issuing agencies.[11]

### B. The Convention

Three weeks after Congress enacted the Ocean Dumping Act 31 nations, including the United States, adopted the Convention on the Dumping of Wastes at Sea (the Convention), 26 U.S.T. 2403, T.I.A.S. No. 8165, *reprinted at* Joint Appendix (JA) 49–59. The parties to the Convention agreed to "take effective measures individually, according to their scientific, technical and economic capabilities, and collectively, to prevent marine pollution caused by dumping and [to] harmonize their policies in this

---

where relevant, between those provisions and the requirements of the Convention.

2. Pub.L. No. 92-532, 86 Stat. 1052 (1972) (codified at 33 U.S.C. §§ 1401–1444 (1976); 16 *id.* §§ 1431, 1434).

3. Marine Protection Research, and Sanctuaries Act of 1972 (MPRSA) § 101, 33 U.S.C. § 1411 (1976).

4. As originally enacted the Act absolutely prohibited dumping, and transporting for the purpose of dumping, of "any radiological, chemical, or biological warfare agent [and] any high-level radioactive waste." MPRSA § 101(a), (b), 33 U.S.C. § 1411(a), (b) (Supp. III 1970). The 1974 amendments replaced that language with the words "any material." Pub.L. No. 93–254, ʻ 3, 88 Stat. 51 (1974).

5. The contiguous zone "extend[s] to a line twelve nautical miles seaward from the base line from which the breadth of the territorial sea is measured[.]" MPRSA § 101(b), 33 U.S.C. § 1411(b) (1976).

6. MPRSA § 103(a), 33 U.S.C. § 1413(a) (1976). "Dredged material" is defined as "any material excavated or dredged from the navigable waters of the United States." MPRSA § 3(i), 33 U.S.C. § 1402(i) (1976). Permit-granting authority was divided between the Administrator and the Corps "in order not to separate the responsibility for the issuance [by the Corps] of the dredging permit and the permit for disposing of the results of such dredging." H.R.Rep. No. 93–568, 93d Cong., 1st Sess. 6 (1973).

7. MPRSA § 102(a), 33 U.S.C. § 1412(a) (1976).

8. *Id.*

9. *Id.* § 102(c), 33 U.S.C. § 1412(c) (1976).

10. *Id.* § 104(a), 33 U.S.C. § 1414(a) (1976).

11. *Id.* § 104(d), 33 U.S.C. § 1414(d) (1976).

**122**

regard." Convention, Art. II, JA 50. Specifically, the parties agreed to prohibit dumping of materials listed in Annex I to the Convention [12] and to allow dumping of materials listed in Annex II [13] and other waste materials only upon issuance of a prior permit. In addition, the Convention states that "[a]ny permit shall be issued only after careful consideration of all the factors set forth in Annex III, including prior studies of the characteristics of the dumping site, as set forth in Sections B and C of that Annex." *Id.*, Art. IV(2), JA 51. The factors listed in Annex III include those related to the characteristics and composition of the materials to be dumped; dumping site characteristics; the method of disposal; the effect on amenities, on marine life, and on other uses of the sea; and the availability of alternative locations and methods of dumping (including land-based disposal). On August 3, 1973 the Senate advised ratification of the Convention, and on August 30, 1975 the Convention entered into force.

### C. EPA Regulations and History of This Litigation

On October 15, 1973 the Administrator promulgated regulations and criteria to implement the Ocean Dumping Act, 38 Fed. Reg. 28613 (1973), codified at 40 C.F.R. Parts 220–230 (1974). The regulations established the criteria to be considered in evaluating applications for permits (40 C.F.R. Part 227) and designated 123 interim dumping sites.

Congress thereafter amended the Act. In addition to enactment of certain technical amendments, Congress sought to bring MPRSA into conformance with the obliga-

tions of the United States under the Convention [14] and "to incorporate in domestic law those features of the Convention * * which [were not then] included in the basic statute." [15] As an example, the amendments added factors to be considered by the Administrator in promulgating the criteria to be applied to permit applications:

To the extent that he may do so without relaxing the requirements of this title, the Administrator, in establishing or revising such criteria, shall apply the standards and criteria binding upon the United States under the Convention, including its Annexes.[16]

In November 1975 NWF commenced this action challenging the regulations implementing the Ocean Dumping Act, alleging that the regulations violated both the Act and the Convention. In particular, NWF alleged the following deficiencies:

(a) presuming that the dumping would be allowed unless there was evidence of unacceptable adverse impacts, instead of prohibiting all dumping which might unreasonably degrade or endanger the marine environment or human health; (b) allowing the ocean dumping of dredged material without requiring full prior consideration of all evaluation factors specified in the MPRSA and in the Convention * * * ; (c) applying different and less restrictive evaluation factors to the review of dredged material ocean dumping than to the review of other ocean-dumped wastes; and (d) failing to prohibit the ocean dumping of dredged material containing substances the dumping of which is prohibited under Article IV and Annex I of the Convention.[17]

---

**12.** The materials listed in Annex I include "[h]igh-level radio-active wastes or other high-level radio-active matter" and "[m]aterials in whatever form * * * produced for biological and chemical warfare," as well as persistent synthetic materials that may create hazardous conditions, petroleum products, and certain toxic compounds. Convention, Annex I, 26 U.S.T. at 2465, JA 56–57.

**13.** Annex II includes various metals, toxic substances, heavy or bulky wastes, and radioactive

wastes not included in Annex I. *Id.*, Annex II, 26 U.S.T. at 2466, JA 57–58.

**14.** *See* S.Rep. No. 93–726, 93d Cong., 2d Sess. 1 (1974).

**15.** H.R.Rep. No. 93–568, *supra* note 6, at 2.

**16.** Pub.L. No. 93–254, § 4(A)(iii), 88 Stat. 51 (1974).

**17.** Appellant's brief at 20 (footnote omitted).

The Government and NWF filed cross-motions for summary judgment, but while those motions were pending before the District Court the Administrator published proposed revisions to the regulations. 41 Fed. Reg. 26644 (June 28, 1976). A consent order was then filed staying further proceedings until the end of the year.

The revised regulations and criteria establish, *inter alia*, new "Criteria for the Evaluation of Permit Applications for Ocean Dumping of Materials." 40 C.F.R. Part 227 (1979). In addition to the evaluative criteria for interim permits, Part 227 establishes criteria that relate generally to the need for the proposed dumping and to the impact of the proposed dumping upon the environment, upon aesthetic, recreational, and economic values, and upon other uses of the ocean. Section 227.1(b) exempts dredged material from a number of the criteria, including the ban against ocean dumping of oxygen-consuming waste where such dumping will deplete the oxygen content in the area by more than 25 percent, 40 C.F.R. § 227.7(e), and the prohibition of dumping "[w]astes containing living organisms * * * [that] would endanger human health or that of domestic animals, fish, shellfish, and wildlife," 40 C.F.R. § 227.7(c).

Similarly, in Part 228—"Criteria for the Management of Disposal Sites for Ocean Dumping"—Section 228.1 exempts dredged waste dumping sites from that Part's requirements that the "[i]mpact of the disposal at each site * * * be evaluated periodically" (40 C.F.R. § 228.10) and that "[m]odifications in disposal site use * * be made . * * * based on the results of the analyses of impact described in § 228.10 or upon changed circumstances concerning use of the site" (40 C.F.R. § 228.11).

Following publication of the revised regulations in 42 Fed.Reg. 2462 (January 11, 1979), which NWF concedes corrected a substantial number of the defects alleged in its original complaint,[18] the District Court permitted NWF to file a supplemental complaint. NWF then moved for partial summary judgment on Counts 1–5, 7, 8, and 10 of its supplemental complaint. The Government filed cross-motions for summary judgment as to all counts of the supplemental complaint and for dismissal. The District Court, without opinion, entered judgment in favor of the Government and dismissed the action. NWF now seeks review of the District Court's entry of summary judgment and dismissal of Counts 1 through 5.

## II. INTERIM SITE DESIGNATIONS

■ The revised regulations, in addition to establishing the procedures and criteria according to which dumping permits would be evaluated and sites designated and maintained, designated 140 dumping sites on an "interim" basis—127 dredged waste sites and 13 nondredged sites. 40 C.F.R. § 228.12 (1979). The Administrator's approval of interim site designations, which was to be for a maximum period of three years,[19] was

---

18. Appellant's brief at 21.

19. The revised regulations were finally promulgated on January 11, 1977; thus the three-year designation of interim sites expired on January 11, 1980. Five days later the Administrator promulgated interim final amendments to 40 C.F.R. § 228.12, in which he designated dumping sites for dredged and nondredged wastes, again on an interim basis. 45 Fed.Reg. 3053 (Jan. 16, 1980). Some of the interim designations will expire (unless extended by another amendment to the regulation) in 1980, 1982, or 1983. Other designations (of some 85 dumping sites out of a total of 131 interim sites) are for an indefinite period of time. The Government has suggested that the expiration of the 1977 interim designations, and the promulgation of

an amended list of interim designations, moot this aspect of NWF's appeal. We disagree with this contention.

As a technical matter, the designations that NWF challenged in its supplemental complaint no longer have any effect. Thus the precise subject matter of NWF's challenge has ceased to exist. Expiration of 40 C.F.R. § 228.12, however, has not removed from this case " 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant' " consideration of NWF's arguments. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974), *quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). In particular, the doctrine of review of

based on historical usage, not the criteria for site designations, "pending completion of baseline or trend assessment surveys[.]" *Id.*

In Count 4 of its supplemental complaint NWF challenges the designation on the ground that nothing in the Act or in the Convention (as incorporated by the Act) authorizes designation of dumping sites for any length of time without prior completion of studies of the sites' characteristics. The Government's reply is that neither the Act nor the Convention prohibits interim designation of sites pending completion of such studies, and that it should not be assumed that Congress intended that all ocean dumping come to a halt pending completion of lengthy studies of the characteristics of the sites. Thus we are asked by the Government to recognize that there is a "gap" in the existing statutory framework, and to approve the Administrator's action as a reasonable "gap-filler." NWF, on the other hand, denies that there is a gap at all.

The relatively spare statutory language is not dispositive:

> The Administrator may, considering the criteria established pursuant to subsection (a) of this section, designate recommended sites or times for dumping and, when he finds it necessary to protect critical areas, shall, after consultation with the Secretary, also designate sites or times within which certain materials may not be dumped.[20]

The Act does not require the Administrator to designate dumping sites, but it does require consideration of the criteria in making any designations. The Ocean Dumping Act does not specify whether the criteria (including site characteristics studies) should be applied to final or permanent site designations only, or to interim or temporary designations as well. The legislative history is silent on this point, apart from an ambiguous reference to the need to avoid excessive interference with interstate commerce by unduly restricting disposal of dredged spoils.[21]

"short term orders, capable of repetition, yet evading review," *see Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), as applied by this court in *Alton & Southern R. Co. v. Internat'l Ass'n of Machinists & Aerospace Wkrs*, 463 F.2d 872, 878 880 (D.C. Cir. 1972), demonstrates the wisdom of our reaching the merits of NWF's claims.

That the interim designation of unstudied dumping sites is capable of repetition is abundantly clear from the Administrator's action in promulgating interim final amendments to § 228.12 on January 16, 1980. The Government disputes, however, that the three-year designation of interim sites in 1977 was a "short term order * * * evading review." The Government has pointed to no case, however, nor do we know of one, in which a mechanical, fixed-period test has been applied to determine whether a given order was . sufficiently "short-term" to justify consideration of its validity by a court after its expiration or amendment. Such a test would serve no discernible purpose except to shield from review all orders that are promulgated for a fixed period in excess of the established maximum, and as to which the judicial process has not completely run its course on the date of expiration. Such a rule could work much mischief, and we decline to give it our support in this case. The short answer to the Government's contention is merely to point to the fact that

this order has until now escaped final judicial review.

The pendency of a suit in District Court, also brought by NWF, challenging the lawfulness of the January 16 amendments does not change this result. Those amendments are not before this court in this review of the District Court's order, as they were not before the District Court at the time its order was entered. The only way NWF can get judicial review of the amendments is by commencing a new action. The pendency of that case does not rob this court of jurisdiction to consider the legal issue raise by NWF in the present action.

20. MPRSA § 102(c), 33 U.S.C. § 1412(c) (1976).

21. The Conference Report on the compromise version of the bill that was eventually enacted contained these comments:

> It is intended that designation of critical areas by the Administrator shall be exercised with circumspection. Such confined areas are expected to be limited in size and numbers. For the most part, the conferees assume that existing sites for the disposal of dredged material will continue to be used and available. Where this proves impractical, the review and waiver provisions of the bill would be used.
>
> It is expected that until such time as economic and feasible alternative methods for disposal of dredge material are available, no

There can be little doubt that NWF's interpretation would lead to a harsh result: virtual cessation of all ocean dumping until site studies could be completed. It appears that even after three years studies have been completed for only three sites.[22] It is possible, of course, that the studies might have been completed with considerably more alacrity had the Administrator felt the Act required their completion before dumping sites were designated. It is indisputable, however, that NWF's interpretation of the Act would have had an immediate and substantially negative effect on ocean dumping for a considerable period of time. We will not lightly assume that such was Congress' intent, especially where the statute and its history afford no reasonable basis for doing so. *See United States v. Mendoza*, 565 F.2d 1285 (5th Cir. 1978). It might be expected, for instance, that had Congress intended an immediate halt to ocean dumping pending completion of site studies, some consideration would have been given to the problem of waste disposal in the interim, or that a waiver or override provision might have been considered to alleviate hardship, or to protect health and property, while the studies were being conducted. We do not mean to read too much into Congress' silence on this point. We simply find the Government's position to be reasonable and consistent with the statutory scheme.

NWF also argues that the designation of interim sites without benefit of prior studies violates the even more restrictive site-designation provision of the Convention. The Convention provides:

> unreasonable restrictions shall be imposed on dredging activities essential for the maintenance of interstate and foreign commerce, and that, consistent with the intent of this act, the disposal activities of private dredgers and the Corps of Engineers will be treated similarly.
>
> H.R.Rep. No. 92–1546, 92d Cong., 2d Sess. 17 (1972). It is clear at least from this excerpt that Congress was concerned that implementation of the Act did not interfere unduly with dredging operations. This passage does not indicate whether, as NWF has suggested, Congress intended to rely upon the waiver provi-

> Any permit shall be issued only after careful consideration of all the factors set forth in Annex III, including prior studies of the characteristics of the dumping site, as set forth in Sections B and C of that Annex.[23]

This language adds little to our consideration of the problem. First, it is as susceptible to doubt concerning the intention of the parties as is the Ocean Dumping Act. It is not clear that the parties intended to impose immediate and total restrictions upon all ocean dumping and to foreclose a less disruptive approach to implementation of their agreement. Second, the Convention's substantive provisions must be read in light of Articles I and II. Article I obligates the parties "to take all *practicable* steps to prevent the pollution of the sea by the dumping of waste and other matter * * *." (Emphasis added.) Article II obligates the parties to "take effective measures individually, according to their scientific, technical and economic capabilities, and collectively, to prevent marine pollution by dumping * * *." Both of these provisions make NWF's more rigid interpretation of Article IV, paragraph 2, of doubtful validity. Finally, Article IV, paragraph 2, was not incorporated in the statute by the 1974 amendments to the Ocean Dumping Act. The only relevant amendment added the following language to the statute:

> To the extent that he may do so without relaxing the requirements of this title, the Administrator, *in establishing or revising such criteria*, shall apply the standards and criteria binding upon the United States under the Convention, including its Annexes.[24]

sion of the Act, 33 U.S.C. § 1413(d) (1976), alone as a means to avoid interruptions of commerce, or whether the Administrator was also granted authority to make reasonable accommodation for these needs and concerns in his implementation of the statutory mandate.

22. Appellees' brief at 39.

23. Convention, Art. IV, ' 2, JA 51.

24. Pub.L. No. 93–254, ' 4(A), 88 Stat. 51 (1974) (emphasis added), *amending* 33 U.S.C. § 1412(a) (Supp. III 1970).

This amendment merely requires application of the Convention's standards and criteria by the Administrator in establishing or revising criteria. It does not by its terms apply to either the application of criteria to permit applications or the designation of dumping sites.

■ In sum, we see no reason, in the language of the Act, in the applicable provision of the Convention, or in the legislative history, to adopt NWF's position with regard to interim designation of unstudied dumping sites. Lacking an affirmative basis for such a result, we conclude that the District Court properly entered summary judgment in favor of the Government on Count 4.[25]

### III. THE CORPS' DESIGNATION OF SITES AND APA RULEMAKING REQUIREMENTS

Section 228.4 of the revised regulations and criteria establishes the procedures to be followed in designating dumping sites, and Section 228.4(e) applies to site designations by the Corps in the course of its issuance of dredged material dumping permits. Sites may be designated by the Administrator through his promulgation of designated sites in Part 228 of the regulations, or they may be designated by the Corps. Section 228.4(e)(2) describes when and how the Corps may authorize dumping of dredged material at sites other than those designated by the Administrator in Part 228:

(2) In those cases where a recommended disposal site has not been desig-

nated by the Administrator, or where it is not feasible to utilize a recommended disposal site that has been designated by the Administrator, the District Engineer shall, in consultation with EPA, select a site in accordance with the requirements of §§ 228.5 and 228.6(a). Concurrence by EPA in permits issued for the use of such site for the dumping of dredged material at the site will constitute EPA approval of the use of the site for dredged material disposal only.[26]

In one of the claims contained in Count 2 of the supplemental complaint NWF objects to this provision on the ground that site designation constitutes a "rulemaking" as that term is used in the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559 (1976).[27] It argues that Section 228.4(e)(2) impermissibly fails both to require that general notice of proposed site designation be published in the *Federal Register* and to give interested persons an opportunity to comment on the proposal, as required by Section 4 of the APA, 5 U.S.C. § 553 (1976).

The Government does not dispute that the Corps' designation of dredged material dumping sites constitutes a rulemaking under the APA, but it suggests that the Corps' own regulations obligate it to give public notice of any proposed site designation and an opportunity to comment upon such a designation. *See* 33 C.F.R. §§ 209.145(g), 325.3 (1979). The Government appears to conclude that the Corps' regulations satisfy the APA and fill in the gap left by the failure of Section 228.4(e)(2) to require pub-

---

25. Because of our earlier discussion of the 1980 amendments to the interim site designation portion of the revised regulations, *see* note 19 *supra*, we should make clear what issue we have not decided in this portion of our opinion. As the 1980 amendments were not before the District Court, and are not before us for our review in this appeal, we express no opinion as to their validity under the Ocean Dumping Act or any other statute.

26. 40 C.F.R. § 228.4(e)(2) (1979). Section 103(c) of the Act, 33 U.S.C. § 1413(c) (1976), requires the Corps to notify the Administrator of its intention to issue a dumping permit under § 103(a). If the Administrator disagrees with the Corps' determination as to compliance with

the Administrator's criteria, the Administrator's opinion prevails.

27. Section 2(c) of the APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy * * *." 5 U.S.C. § 551(4) (1976). That part of a dredged waste permit that designates a dumping site unquestionably has "particular applicability and future effect," and the designation of special dumping sites by the Corps is an implementation of the law just as surely as is the Administrator's designation of dumping sites.

lication and opportunity to comment. In our view, the Corps' regulations fall short of the procedures specified by Section 4 of the APA. The Corps' regulations fail both to provide for publication of the "rulemaking" at least 30 days before the permit becomes effective and to require that the Corps provide a contemporaneous statement of basis and purpose. In addition, it is doubtful that anything less than *Federal Register* publication of notice of the proposed permit issuance will satisfy the APA in these circumstances, again assuming that the Corps' issuance of permits can constitute a rulemaking. Nevertheless, we hold that the Government was entitled to summary judgment as to this issue, but not for reasons advanced by the Government either in this court or before the District Court. *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court explicated the ripeness doctrine and identified a two-pronged test for analyzing ripeness problems:

> [I]t is fair to say that [the] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.* at 148–149, 87 S.Ct. at 1515. While there can be no doubt that the regulation in issue is a "final agency action" within the meaning of Section 10 of the APA, 5 U.S.C. § 704 (1976), consideration of other aspects of the *Abbott Laboratories* approach convinces us that this issue is not ripe for judicial decision at this time.

We first note that NWF has not alleged that the Corps has issued a permit for dumping at a site not designated by the Administrator without satisfying the requirements of 5 U.S.C. § 553. Nor has any party complained in this action that it did not receive either actual or constructive notice of any proposed action on a permit application. We have not been apprised of an instance in which there was neither *Federal Register* publication nor actual knowledge of the proposed permit issuance. We should avoid adjudication of an issue that at this time is excessively speculative and remote.

More importantly, NWF's argument asks us to determine that the Corps' permit application activities are in effect a rulemaking under the APA. NWF points to no cases that have held that the procedures specified in Section 4 of the APA for rulemaking apply to such activities, and our own research has disclosed none. But even assuming that this argument might prevail, given an appropriate factual situation, it is too early to tell whether the Corps' actions under these regulations will present an appropriate occasion for such a holding. In the absence of any information as to the Corps' permitting policies and practices, it is quite impossible to determine whether the selection by the Corps of nondesignated sites has a generality of application and futurity of effect that is the distinguishing characteristic of rulemaking. 5 U.S.C. § 551(4) (1976); *Pacific Coast European Conference v. FMC*, 376 F.2d 785, 790 (D.C. Cir. 1967). If, as the statute, the revised criteria and regulations, and the record make it appear, the Corps' designation of dumping sites is purely an exercise of its licensing authority, nothing in the Ocean Dumping Act or in the APA would appear to require that the Corps follow the procedures of Section 4 of the APA.

In addition, this case is not one in which postponement of court consideration of the issue will visit any hardship upon the parties. When and if the Corps engages in rulemaking without following the procedures of Section 4 of the APA, aggrieved parties may obtain appropriate declaratory

and injunctive relief. Thus we conclude that the District Court's grant of summary judgment and dismissal as to this aspect of Count 2 was proper and should be affirmed.[28]

## IV. TREATMENT OF DREDGED AND NONDREDGED WASTES

### A. *The Challenged Criteria*

Pursuant to the requirements of the Ocean Dumping Act,[29] the Administrator has promulgated revised criteria that are to guide him in designating sites and times for dumping,[30] and are to be applied by both him and the Corps in their consideration of dumping permits for, respectively, nondredged and dredged wastes.[31] The Act states that, "in establishing or revising such criteria, [the Administrator] shall consider, but not be limited in his consideration to, the following" factors:

(A) The need for the proposed dumping.

(B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

(C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.

(D) The effect of such dumping on marine ecosystems, particularly with respect to—

(i) the transfer, concentration, and dispersion of such material and its by-products through biological, physical, and chemical processes,

(ii) potential changes in marine ecosystem diversity, productivity, and stability, and

(iii) species and community population dynamics.

(E) The persistence and permanence of the effects of the dumping.

(F) The effect of dumping particular volumes and concentrations of such materials.

(G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

(H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and non-living resource exploitation.

(I) In designating recommended sites, the Administrator shall utilize wherever feasible locations beyond the edge of the Continental Shelf.[32]

In addition, the statute, as amended in 1974, provides:

To the extent that he may do so without relaxing the requirements of this subchapter, the Administrator, in establishing or revising such criteria, shall apply the standards and criteria binding upon the United States under the Convention, including its Annexes.[33]

**28.** We do not decide the validity of NWF's contention that the Corps' licensing activities constitute rulemaking under the APA. We simply hold that the record does not offer enough detail to support the theory advanced by NWF, whatever the merits of that theory may be, and that it does not appear from the record that either the Corps or the Administrator has in fact violated the APA. In addition, we note that the Corps is authorized under the Ocean Dumping Act to select nondesignated dumping sites in approving permit applications, *see* 33 U.S.C. § 1413(a), (b) (1976), and that an agency's licensing authority is a recognized instrument of announcing and effectuating policy. *See* L. Jaffe & N. Nathanson, Administrative Law—Cases and Materials 12–14, 19–20 (4th ed. 1976). Experience with the Ocean

Dumping Act may show that site designations by the Corps constitute rulemaking, but NWF's arguments alone will not suffice. *Compare Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), *with NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

**29.** MPRSA § 102(a), 33 U.S.C. § 1412(a) (1976).

**30.** *Id.* § 102(c), 33 U.S.C. § 1412(c) (1976).

**31.** *Id.* §§ 102(a), 103(b), 33 U.S.C. §§ 1412(a), 1413(b) (1976).

**32.** *Id.* § 102(a), 33 U.S.C. § 1412(a) (1976).

**33.** *Id.*

The Convention's "standards and criteria" are set forth in its Annex III, which lists 21 "[p]rovisions to be considered in establishing criteria governing the issue of permits for the dumping of matter at sea * * *." Convention, Annex III, JA 58. The 21 provisions, which are grouped into three sets ("Characteristics and Composition of the Matter," "Characteristics of Dumping Site and Method of Deposit," and "General Considerations and Conditions"), are set out in the margin.[34]

The revised criteria establish guidelines for evaluation of permit applications (other than applications for interim permits) in

Part 227, Subparts B–E and G (Definitions). The substantive subparts cover related criteria in the following manner:

Subpart B—Environmental Impact

Subpart C—Need for Ocean Dumping

Subpart D—Impact of the Proposed Dumping on Esthetic, Recreational and Economic Values

Subpart E—Impact of the Proposed Dumping on Other Uses of the Ocean

The Act provides that the Corps, in evaluating applications for dumping permits for dredged wastes, "shall apply those criteria, established pursuant to section 1412(a) of this title, relating to the effects of the

---

34. ANNEX III

Provisions to be considered in establishing criteria governing the issue of permits for the dumping of matter at sea, taking into account Article IV(2), include:

*A.—Characteristics and composition of the matter*

1. Total amount and average composition of matter dumped (*e.g.* per year).

2. Form, *e.g.* solid, sludge, liquid, or gaseous.

3. Properties: physical (*e.g.* solubility and density), chemical and biochemical (*e.g.* oxygen demand, nutrients) and biological (*e.g.* presence of viruses, bacteria, yeasts, parasites).

4. Toxicity.

5. Persistence: physical, chemical and biological.

6. Accumulation and biotransformation in biological materials or sediments.

7. Susceptibility to physical, chemical and biochemical changes and interaction in the aquatic environment with other dissolved organic and inorganic materials.

8. Probability of production of taints or other changes reducing marketability of resources (fish, shellfish, etc.).

*B.—Characteristics of dumping site and method of deposit*

1. Location (*e.g.* co-ordinates of the dumping area, depth and distance from the coast), location in relation to other areas (*e.g.* amenity areas, spawning nursery and fishing areas and exploitable resources).

2. Rate of disposal per specific period (*e.g.* quantity per day, per week, per month).

3. Methods of packaging and containment, if any.

4. Initial dilution achieved by proposed method of release.

5. Dispersal characteristics (*e.g.* effects of currents, tides and wind on horizontal transport and vertical mixing).

6. Water characteristics (*e.g.* temperature, pH, salinity, stratification, oxygen indices of pollution—dissolved oxygen (D)), chemical oxygen demand (COD), biochemical oxygen demand (BOD)—nitrogen present in organic and mineral form including ammonia, suspended matter, other nutrients and productivity).

7. Bottom characteristics (*e.g.* topography, geochemical and geological characteristics and biological productivity).

8. Existence and effects of other dumpings which have been made in the dumping area (*e.g.* heavy metal background reading and organic carbon content).

9. In issuing a permit for dumping, Contracting Parties should consider whether an adequate scientific basis exists for assessing the consequences of such dumping, as outlined in this Annex, taking into account seasonal variations.

*C.—General considerations and conditions*

1. Possible effects on amenities (*e.g.* presence of floating or stranded material, turbidity, objectionable odour, discolouration and foaming).

2. Possible effects on marine life, fish and shellfish culture, fish stocks and fisheries, seaweed harvesting and culture.

3. Possible effects on other uses of the sea (*e.g.* impairment of water quality for industrial use, underwater corrosion of structures, interference with ship operations from floating materials, interference with fishing or navigation through deposit of waste or solid objects on the sea floor and protection of areas of special importance for scientific or conservation purposes).

4. The practical availability of alternative land-based methods of treatment, disposal or elimination, or of treatment to render the matter less harmful for dumping at sea. Convention, Annex III, 26 U.S.T. at 2467–2468, JA 58–59.

dumping." [35] The revised criteria specifically provide as follows:

(b) With respect to the criteria to be used in evaluating disposal of dredged materials, this section [36] and Subparts C, D, E, and G apply in their entirety. To determine whether the proposed dumping of dredged material complies with Subpart B, only §§ 227.4 ["Criteria for evaluating environmental impact"], 227.5 ["Prohibited materials"], 227.6 ["Constituents prohibited as other than trace contaminants"], 227.9 ["Limitations on quantities of waste materials"], 227.10 ["Hazards to fishing, navigation, shorelines or beaches"] and 227.13 ["Dredged materials"] apply. An applicant for a permit to dump dredged material must comply with all of Subparts C, D, E, G, and applicable sections of B, to be deemed to have met the EPA criteria for dredged material dumping promulgated pursuant to section 102(a) of the Act. * * *

40 C.F.R. § 227.1(b) (1979). The effect of this provision is to exempt dredged material permit applications from the following criteria in Subpart B:

§ 227.7 Limits established for specific wastes or waste constituents.

§ 227.8 Limitations on the disposal dates of toxic wastes.

§ 227.11 Containerized wastes.

§ 227.12 Insoluble wastes.

**35.** MPRSA § 103(b), 33 U.S.C. § 1413(b) (1976).

**36.** "This section" refers to 40 C.F.R. § 227.1 ("Applicability"). In addition to establishing the applicability of Part 227's criteria to various types of permit applications, this section provides:

(d) After consideration of the provisions of §§ 227.28 and 227.29, no permit will be issued when the dumping would result in a violation of applicable water quality standards.

40 C.F.R. § 227.1(d) (1979).

**37.** 40 C.F.R. § 227.7(c) & (e) provides:

Materials containing the following constituents must meet the additional limitations specified in this section to be deemed acceptable for ocean dumping:

\* \* \* \* \* \*

(c) Wastes containing living organisms may not be dumped if the organisms present

In Count 3 NWF challenges the Administrator's decision to exempt dredged waste permits from the requirements of Section 227.7(c) and (e) concerning materials that contain dangerous microorganisms and oxygen-consuming constituents.[37]

Part 228 of the revised regulations and criteria establishes "Criteria for the Management of Disposal Sites for Ocean Dumping." This Part provides procedures and guidelines for selecting and designating dumping sites, for managing the disposal sites, and for monitoring and evaluating the impact of dumping upon the sites. Dredged material disposal sites are covered only by Sections 228.4(e) (procedures for designation of dredged waste disposal sites), 228.9 (disposal site monitoring), and 228.12 (designation of interim dumping sites). 40 C.F.R. § 228.1 (1979). Among the sections in Part 228 that do not apply to dredged waste sites, NWF complains in particular of the Administrator's exemption of Sections 228.10 and 228.11, which deal with "[e]valuating disposal impact" and "[m]odification in disposal site use," respectively (Count 1). In addition, NWF objects to Section 228.-4(e), which applies fewer restrictions on designation of dredged waste dumping sites than on designation of non-dredged sites (Count 2).[38]

would endanger human health or that of domestic animals, fish, shellfish and wildlife by:

(1) Extending the range of biological pests, viruses, pathogenic microorganisms or other agents capable of infesting, infecting or extensively and permanently altering the normal populations of organisms;

(2) Degrading uninfested areas; or

(3) Introducing viable species not indigenous to an area.

\* \* \* \* \* \*

(e) Wastes containing biodegradable constituents, or constituents which consume oxygen in any fashion, may be dumped in the ocean only under conditions in which the dissolved oxygen after allowance for initial mixing, as defined in § 227.19, will not be depressed by more than 25 percent below the normally anticipated ambient conditions in the disposal area at the time of dumping.

**38.** NWF challenges three provisions in particular. It summarizes its challenge as follows:

Finally, NWF challenges in Count 5 of its supplemental complaint the criteria's failure "with minor exceptions * * *, to specify the use of chemical characterization procedures." [39] NWF claims that nonchemical bioassay tests are impermissibly relied upon "to the virtual exclusion of chemical tests." [40]

NWF's objections are based upon three arguments, which will be considered in detail in the sections that follow. First, NWF argues that some of the provisions described above represent the Administrator's failure to apply or adhere to all of the evaluation factors listed in Section 102(a) of the Act and in Annex III of the Convention (which Section 102(a) incorporates into the Act by reference). Second, it argues that some of these provisions impermissibly treat dredged and nondredged wastes differently, while the Act requires that the two types of materials be treated the same. Finally, NWF claims that some of the criteria have no rational basis that is or can be articulated by the Administrator.

### B. *Applicability of the Evaluation Factors*

██ NWF objects to four aspects of the criteria [41] in part because they do not incorporate, at least with respect to dredged wastes, the evaluation factors listed in the Ocean Dumping Act and the Convention.

> a. *§ 228.4(e)(1)(i)* —singles out dredged material dumpsites as being susceptible to unsystematic *ad hoc* study on the basis of not-yet-completed research, while all other dumpsites must be evaluated strictly on the basis of the eleven specific site selection criteria of § 228.6;
> b. *§ 228.4(e)(1)(ii)* —specifies only that an environmental assessment "may" be prepared, rather than making it mandatory; requires the preparation only of an "environmental impact assessment," a document far less formal and detailed than the environmental impact statement required for all other ocean dumpsites and one for which circulation for interagency and public review and comment is not required; and it permits a single assessment to be prepared for all dumpsites within "a particular geographic area," rather than requiring the individualized site-by-site evaluation mandated for all other ocean dumpsites * * *; and

NWF regards these factors as mandatory elements of any valid set of ocean dumping criteria, and it argues that the criteria impermissibly disregard certain factors in their treatment of dredged wastes.

In support of its position NWF points to the Ocean Dumping Act's requirement that, "in establishing or revising [the] criteria, [the Administrator] shall consider, but not be limited in his consideration to," the factors listed in Section 102(a) and Annex III. NWF asserts that it is not enough for the Administrator to claim that he considered— and then rejected—those factors; the criteria must "reflect" application of the evaluation factors. In short, NWF contends that the criteria must incorporate the evaluation factors of the Act and the Convention.

NWF also relies upon the legislative history of the Act to support its argument. It notes that "both committee reports specify that '[t]he criteria as established or revised *must take into account*, but need not be limited to,' the stated factors. H.R.Rep. No. 361, 92d Cong., 1st Sess. 18 (1971); S.Rep. No. 451, 92d Cong., 1st Sess. [20] (1971) * * * (emphasis added)." [42]

NWF also points to the language added to Section 102(a) by the 1974 amendment: "[T]he Administrator, in establishing or revising such criteria, shall apply the standards and criteria binding upon the United States under the Convention * * *."

> c. *§ 228.4(e)(2)* —exempts the selection of dredged material ocean dumpsites by the Corps from the rulemaking requirements applicable to the designation of all other dumpsites by EPA (§ 228.6(b)).
> Appellant's brief at 39–40 (citations omitted).

**39.** *Id.* at 32 (citations omitted).

**40.** *Id.*

**41.** NWF argues that the criteria fail to incorporate the Act's evaluation factors in at least four respects: periodic dumpsite evaluation (40 C.F.R. §§ 228.10, 228.11), oxygen-consuming constituents (*id.* § 227.7(e)), dangerous microorganisms (*id.* § 227.7(c)), and chemical characterization.

**42.** Appellant's brief at 26 (first brackets in original).

From this language NWF concludes that "the Convention's standards and criteria must actually be *applied* and cannot simply be considered and ignored."[43]

The Government's response to NWF is based upon the plain language of the statute, which requires only that the Administrator *consider* certain evaluation factors. It argues that the statutory language is broad enough to permit the Administrator to determine that certain of the factors may not be relevant to evaluation of a particular permit application. The Government concedes that the Ocean Dumping Act requires the Administrator to consider all of the factors listed in the statute and the Convention. But it denies that the statute requires different materials to be treated as if they were the same.

Based upon the statutory language, and in the absence of any compelling reasons to ignore that language, we conclude that the Administrator has authority to conclude that certain statutory evaluation factors are inapplicable to a class or type of material. "Consider" does not mean "include," and the Administrator may properly consider an evaluation factor and conclude that, in an appropriate instance, that factor need not result in criteria which must be applied in every case. The Act gives unqualifiedly broad authority to the Administrator to weigh and consider the evaluation factors and, to the extent that he does so, the criteria he promulgates will "reflect" the factors listed in the Act and the Convention. Had Congress intended to require literal inclusion of all of the evaluation factors in the criteria that apply to permit applications, far more explicit language was available for it to convey this meaning than the language it in fact employed.

The legislative history does not indicate that Congress intended to limit the Administrator's discretion. To the extent that the criteria are the result of the Administra-

tor's consideration of the evaluation factors, it is no exaggeration to say that the criteria themselves "take those factors into account." Thus viewed, the legislative history provides no more support, and perhaps less, for NWF's position than for the Government's.

### C. The "Equivalence Requirement"

■ NWF objects to five aspects of the criteria,[44] based in part upon their alleged failure to satisfy what NWF terms the "equivalence requirement." NWF argues that the Ocean Dumping Act does not permit the Administrator to treat dredged and nondredged wastes differently, except in those limited respects as to which the statute specifies that different treatment is appropriate. Thus Section 103(b) requires the Corps to consider permit applications for dredged material in light of the criteria promulgated by the Administrator that relate to the effects of the dumping. It does not, argues NWF, authorize the Corps or the Administrator to choose from among the criteria for nondredged material those criteria that will be applied to dredged wastes.

The Government responds that Section 103(b) merely delineates the spheres of responsibility of the Administrator and the Corps. That section makes clear that the Administrator has the responsibility for promulgating criteria that will apply to applications for dredged wastes, but that it is the Corps that will evaluate the applications in light of the criteria. The Government expressly disavows the notion, advanced by NWF, that Section 103(b) imposes an affirmative obligation upon the Administrator to promulgate criteria for dredged and nondredged wastes that are identical. In addition, the Government points to the language of Section 102(a) which allows the Administrator to consider factors other

---

**43.** *Id.* (emphasis in original).

**44.** The five aspects of the criteria that NWF claims violate the "equivalence requirement" by establishing a lesser standard for dredged than for nondredged wastes deal with periodic

dumpsite evaluation (40 C.F.R. §§ 228.10, 228.-11), site designation criteria (*id.* § 228.4(e)), oxygen-consuming constituents (*id.* § 228.7(e)), dangerous microorganisms (*id.* § 227.7(c)), and chemical characterization.

than those listed in the Act in promulgating criteria, and one such factor is the alleged nonequivalence of dredged and nondredged waste materials.

We disagree with NWF's contention that the statute imposes an "equivalence requirement" upon the Administrator with regard to dredged and nondredged wastes. For the reasons discussed in the immediately preceding section of this opinion, we view the Act as having delegated sufficient discretion to the Administrator to permit him to find that, at least in certain respects, dredged wastes differ significantly from nondredged wastes. Had Congress intended to circumscribe the Administrator's authority as rigidly as NWF suggests, it could have done so more explicitly than through its silence. In the absence of compelling historical or policy considerations, we will not read more into the Act's language than Congress has written.

D. *The Distinction Between Dredged and Nondredged Wastes*

1. Generally.

 NWF's third challenge to the criteria argues that, even if the distinction between dredged and nondredged materials is legally permissible, the distinction does not have a reasonable basis and is arbitrary and capricious.[45] NWF also points to the Government's failure adequately to explain the rationale for the disparate treatment of dredged and nondredged wastes in the preamble to the final revised regulations and criteria. We agree with the latter argument. The terms "dredged waste" and "nondredged waste" have no commonly un-

derstood meaning or significance. Further, we have no sufficient basis on this record for concluding that dredged and nondredged materials are significantly different. The Administrator's failure to explain at least the basis for his determination that the differences between the two types of waste justify their different treatment is fatal to the revised criteria and regulations. In order fully to understand how we reach this conclusion, however, it is necessary to review the history of the revised regulations and criteria.

The Administrator proposed major substantive changes to the then existing regulations and criteria on June 28, 1976, 41 Fed.Reg. 26644 (1976). These proposals generated a substantial response from industry, from governments, and from environmental and other public interest groups. The comments, and EPA's responses, run to over 500 pages and are included in Volume II of the final environmental impact statement. EPA also held a technical workshop in Reston, Virginia to discuss various aspects of the proposed revisions, at which the use of bioassays (as opposed to extensive chemical analysis) and the comparability of dredged and nondredged wastes were discussed at some length.[46] NWF submitted four separate sets of comments—in July, August, and September 1976—and participated in the two-day Reston workshop. The period for comment on the proposed revised criteria and the environmental impact statement closed September 24, 1976. As noted earlier in this opinion, the final revised regulations and criteria were published in the *Federal Register* on January

---

**45.** We disagree with the Government's assertion that this issue is not properly before this court on appeal. Government's Post-Argument Submission at 2. It is true that NWF did not allege in its supplemental complaint that the distinction drawn in the revised regulations and criteria is arbitrary and capricious. Such arguments were made, however, by NWF in its motion for partial summary judgment. *See* Plaintiff's Statement of Points and Authorities at 1-2, 8 n.2, 16, 17 (filed July 27, 1977). This court may consider issues raised by a summary judgment motion, even where the issues are not raised in the complaint, since the motion

may be deemed to have initiated the process of amendment. It would have been reversible error for the District Court to deny summary judgment where meritorious grounds are urged in the motion but not pleaded in the complaint. *In re Zweibon*, 565 F.2d 742, 747 n.20 (D.C. Cir. 1977) *(per curiam)*; 10 C. Wright & A. Miller, Federal Practice and Procedure § 2722 at 477 n.22 (1973).

**46.** A transcript of the proceedings at the two-day workshop is contained as Appendix G in the final environmental impact statement (Volume I).

11, 1977. The final environmental impact statement was made public on February 7, 1977.

## 2. Section 4(c) of the APA.

Section 4(c) of the APA, 5 U.S.C. § 553(c) (1976), imposes upon agencies engaged in informal rulemaking a number of requirements that bear upon the agencies' decision-making activities:

> [T]he agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. * * *

While delineation of the scope of judicial review of informal rulemaking by an agency remains something of "a frontier problem," [47] some aspects of our review have been clarified as our experience with the APA has grown. In particular, the relationship between the twin requirements that the agency consider submitted comments and provide "a concise general statement of * * * basis and purpose" and the task of the reviewing court are by now familiar, at least in their broad outlines. As to the two APA requirements, their relatedness was recognized early on by the Conference Committee that reported on the APA in bill form:

> The agency must analyze and consider all relevant matter presented. The required statement * * * should not only relate to the data so presented but with reasonable fullness explain the actual basis and objectives of the rule.[48]

And a reviewing court, asked to pass on the rationality of a regulation, benefits as much as the public from compliance with the requirement of a "general statement":

> It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered. * * * [T]he agencies do not have quite the prerogative of obscurantism reserved to legislatures. * * *

*United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 252 (2d Cir. 1977). This court has made explicit the degree of detail that is required by the APA. Judge McGowan has written:

> We do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rule making. We do expect that, if the judicial review which Congress has thought it important to provide is to be meaningful, the "concise general statement of * * * basis and purpose" mandated by Section 4 will enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.

*Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C. Cir. 1968) (ellipsis in original). An overtechnical reading of the words "concise" and "general" will undoubtedly produce results unintended by Congress and inconsistent with the requirements of the APA. Thus the agency and the courts should strive to assure that the important goal behind the "concise general statement" requirement is achieved.

One of the major issues throughout this rulemaking process was the different treatment accorded dredged and nondredged wastes by the revised regulations and criteria. This issue, in fact, became one of two dominant issues considered at the Agency's two-day workshop in September 1976. As the Administrator wrote in the preamble to the final revised regulations and criteria, "Many of the comments severely criticized * * * the differences between the dredged material criteria and the criteria

---

**47.** Leventhal, *Nature and Scope of Judicial Review, in* C. Christensen & R. Middlekauf, Federal Administrative Law: Practice and Procedure 293, 298 (1977), *quoted in* W. Gellhorn, C. Byse & P. Strauss, Administrative Law—Cases and Comments 298 (7th ed. 1979).

**48.** S.Rep. No. 752, 79th Cong., 1st Sess. 15 (1945).

for other materials." 42 Fed.Reg. 2462, 2466 (January 11, 1977). Yet nowhere in the preamble is there more than a paraphrase of the substantive provisions themselves, let alone any statement explaining why it was deemed necessary or sufficient to exempt dredged materials from the restrictions placed on oxygen-consuming constituents and dangerous microorganisms, to require less extensive testing procedures for dredged than for nondredged materials, or to establish less stringent site designation criteria and site evaluation procedures. It is impossible to tell the extent to which the Administrator considered conflicting views or alternative approaches to the treatment of dredged wastes. There is no indication as to which factors were deemed more or less important than others. In short, the record is devoid of any statement, concise and general or otherwise, of the basis for the choices made.[49]

We asked counsel for the Government during oral argument to indicate where in the rulemaking record it appeared that the Administrator considered and discussed the reasons for distinguishing between dredged and nondredged materials, at least with respect to oxygen-consuming constituents and dangerous microorganisms. Significantly, the Government directs us to a letter written by the Deputy Director of Civil Works for the Corps and sent to NWF on March 21, 1977, more than two months after promulgation of the final revised regulations and criteria.[50] In addition, the Government's post-argument submission cites "basic scientific studies relied upon by the Administrator," the sole references to which are contained in the Corps' March 21, 1977 letter to NWF. The inadequacy of this letter, in light of our prior discussion, should be manifest. A letter from an officer of the Corps, prepared months after promulgation of final regulations and criteria, is not a substitute for a contemporaneous statement by the Administrator (or his agent) in which the basis for such a major policy decision is described in a general and concise manner. A record that contains anything less, as this record does, simply provides an inadequate basis for judicial review.

## V. CONCLUSION

To recapitulate briefly our holding in the preceding two sections: We hold today that the Administrator is not required by any provision in the Act to include in the criteria, in any literal sense, the evaluation factors listed in the Act or the Convention. Rather, he will have satisfied the requirements of Section 102(a) by considering those factors, by taking them into account, when he establishes the criteria. The Act does not compel him to promulgate identical criteria for dredged and nondredged wastes. He must, of course, consider the applicability of the same evaluation factors, but he may rationally conclude that the evaluation factors require certain criteria for one kind of waste and other criteria for another. For the reasons indicated, however, we hold that the Administrator has failed to explain the basis for his conclusion.

It is thus necessary to vacate the District Court's order insofar as it grants summary judgment and dismisses the action as to Counts 1, 2, 3, and 5. In so doing we instruct the District Court to enter summary judgment on those counts[51] in NWF's

---

**49.** The resulting vagueness and imprecision leave interested parties to guess as to exactly what the Agency has decided. Not the least significant result of this failure to state reasons for the choices that were made is to make it impossible, for all practical purposes, for petitioner to file a meaningful and intelligent petition for reconsideration. This effectively denies petitioner a less expensive and time-consuming method of challenge and denies the Administrator a final opportunity to correct errors in the regulations. The deleterious effect of such a failure on meaningful judicial review has already been noted. *Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 711 (D.C. Cir. 1977).

**50.** *See* JA 60.

**51.** NWF makes two separate arguments in Count 2 of its supplemental complaint. As our discussion in Part II *supra* indicates, the Government—not NWF—is entitled to summary judgment as to that part of Count 2 which challenges 40 C.F.R. § 228.4(e) on APA-related grounds. NWF, however, is entitled to summa-

favor, to vacate the revised regulations and criteria, to the extent they treat dredged and nondredged materials differently (as identified in Counts 1, 2, 3, and 5), and to remand the case to EPA. The Administrator will then have an opportunity to promulgate new revised regulations and criteria with a contemporaneous statement of basis and purpose. *See Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 711–712 (D.C. Cir. 1977). We note that this disposition may have an impact upon third parties currently operating under dredged material dumping permits, and that it raises subtle issues with respect to the timing of the vacation of the revised criteria and regulations and of EPA's promulgation of a rule that is consistent with our opinion. We express no opinion on these issues, but rather expect that the District Court will address these and any related issues, with the aid of the parties, on remand.

*Vacated in part and remanded.*

ry judgment as to its argument, also contained in Count 2, that the revised site designation criteria impermissibly differentiate between dredged and nondredged wastes. *See* Part IV *supra.*