**MANATEE COUNTY, a political subdivision of the State of Florida on behalf of itself, its citizens, residents, and visitors, Plaintiff,**

**City of Holmes Beach, City of Anna Maria, Plaintiff/Intervenors,**

v.

**Anne GORSUCH, as Administrator, U.S. Environmental Protection Agency, Charles R. Jeter, as Regional Administrator Region IV, U.S. Environmental Protection Agency, John O. Marsh, Jr., Sec. U.S. Dept. of Army, Alfred B. Devereaux, District Engineer, Jacksonville District, U.S. Army Corps of Engineers, Defendants,**

**Tampa Port Authority, Defendant/Intervenor.**

**No. 82–248–Civ–T–GC.**

United States District Court, M.D. Florida, Tampa Division.

Dec. 22, 1982.

Robert N. Reynolds, William F. Tarr, Miami, Fla., for plaintiffs; Mary Greenwood, Judith Kavanaugh, Bradenton, Fla., of counsel.

Lawrence R. Liebesman, Susan V. Cook, Dept. of Justice, Washington, D.C., for defendants.

Ronald D. McCall, Carole A. Taylor, Anita C. Brannon, Tampa, Fla., for intervening defendants.

## MEMORANDUM OPINION AND RESTRAINING ORDER

GEORGE C. CARR, District Judge.

The plaintiffs, Manatee County, the City of Holmes Beach, and the City of Anna Maria Island [Manatee], have sued the Environmental Protection Agency [EPA] and the U.S. Army Corps of Engineers [Corps] alleging various violations of the National Environmental Protection Act, 42 U.S.C. § 4331, [NEPA], the Marine Protection Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1401 et seq., [Ocean Dumping Act], and the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, Art. IV, 26 U.S.T. 2403, T.I.A.S. No. 8165 (1972). [Ocean Dumping Convention] Although the plaintiffs have made a number of specific allegations, the essence of their contentions can be summarized in one sentence. Put simply, it is the plaintiffs' position that the defendants have illegally dumped dredged material on an interim ocean disposal site in the Gulf of Mexico (i.e., "Site A") without taking into account the serious environmental consequences of their actions. Following a nine day trial and an extensive review of the administrative record, the Court finds, for the reasons explained more fully herein, that the federal defendants have not properly considered the effects of disposal at

Site A and that dumping at the site should be stopped until the required studies are completed.

The material being dumped has been dredged from the Tampa Harbor shipping channel as part of the 43-Foot Tampa Harbor Project, a project authorized by Congress for the widening and deepening of the Tampa Harbor channels. Consequently, several witnesses and parties expressed concern over the effect an injunction of dumping at Site A would have on the completion of the Tampa Harbor Project. In particular, the Tampa Port Authority suggested that even the threat of a delay of the project should be avoided. Therefore, it is important at the outset of this opinion to clarify the scope of the relief which the plaintiffs have requested and which the Court has granted.

The Court is enjoining dumping at Site A, not the deepening project. Since the Corps has admitted that the deepening project is not scheduled to be completed until October of 1984, at the earliest, and that the benefits of the project can not be realized until the entire project is completed, nothing ordered in this Opinion should delay the ultimate completion of the project. To recapitulate, the plaintiffs have not asked that the project be stopped and this Opinion should not be read as stopping it.[1]

I.

As noted above, both the EPA and the Corps are defendants in this action and the plaintiffs have brought different counts against each agency. The plaintiffs contend that EPA violated NEPA by failing to complete an environmental impact statement prior to designating Site A as a disposal site (Count II). EPA is also charged with violating NEPA, the Ocean Dumping Act and the Ocean Dumping Convention by improperly designating Site A as an "interim" disposal site. (Counts V and VI).

It is EPA's position that it was not required to do any studies of Site A prior to designating it as an interim site, see National Wildlife Federation v. Costle, 629 F.2d 118 (D.C.Cir.1980), and that, even if it were a requirement, any error has been cured by the EPA's recent issuance of a Draft Environmental Impact Statement which evaluates both the use of Site A and the potential use of other open water sites. Moreover, because of this ongoing evaluation and decision-making process concerning Site A, the defendants argue that there is no final agency decision before the Court that is ripe for review and that the case against the EPA should be dismissed.

The plaintiffs also contend that the Corps' use of Site A as an ocean disposal site without completing an environmental impact statement constitutes a violation of NEPA. (Count I). In addition, the plaintiffs charge that the Corps violated the Ocean Dumping Act, the Ocean Dumping Convention and its own regulations by failing to do independent studies of the site and the effects dumping would have on marine resources. (Counts IV and VI). Finally, the plaintiffs assert that the Corps violated the Ocean Dumping Act and its regulations by dumping toxic materials on the site and by failing to provide adequate public notices of its dumping project. (Counts III and VII).

Although the Corps admits that it did not complete an EIS on Site A, it contends that the FEIS it prepared in anticipation of the Tampa Harbor Project did take a "hard look" at the environmental consequences of open water disposal and that it has continued to consider these effects throughout all stages of the project. The Corps also contends that it has not dumped toxic materials at the site and that any procedural errors in the issuance of its public notices have been cured.

II.

Before considering the merits of the plaintiffs' claims or the defendants' defens-

1. A more complete discussion of the scope and effects of the injunction is found in Section IV, *infra.*

es, it is appropriate to outline the provisions of the controlling statutes, laws and precedents.

NEPA

■ Congress passed NEPA in 1969 with the avowed purpose of creating and maintaining "conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331. *See* H.R.Rep. No. 91–378, 91st Cong., 1st Sess. 2, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2751. To carry out this purpose, Congress required all federal agencies to prepare detailed environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." A chief bone of contention in most NEPA lawsuits is whether an action is a "major Federal action" with the potential of "significantly affecting the human environment." Unfortunately, the language of the statute offers little specific guidance as to the meaning of these terms. As a result, an agency's determination that an action is not a "major action" or that it will not have a "significant" impact is tested by a standard of reasonableness and will not be disturbed unless it is not fairly supported by the facts. *Sierra Club v. Hassell,* 636 F.2d 1095, 1097–98 (5th Cir.1981). Moreover, since the depth of detail required in each case depends upon its unique facts, the Courts in NEPA cases have focused on whether an agency has taken a "hard look" at the environmental consequences of its proposed action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

*The Ocean Dumping Act*

Congress passed the Ocean Dumping Act in 1972. Unlike NEPA, the Ocean Dumping Act contains a relatively detailed expla-

nation of its aims and requirements. The policy underlying the Act is to "regulate the dumping of all types of materials into ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1401(b). To effectuate this policy, the Act prohibits ocean disposal unless authorized by a permit. 33 U.S.C. § 1401(c). The Act divides this permitting authority between the Corps and the EPA. Thus, the Corps is authorized to issue permits for the disposal of dredged materials, 33 U.S.C. § 1413, and the EPA has permit authority for all other wastes. 33 U.S.C. § 1412(a). In evaluating disposal projects, the Corps and the EPA are required to consider the following factors:[2]

A.  The need for the proposed dumping.

B.  The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

C.  The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.

D.  The effect of such dumping on marine ecosystems, particularly with respect to—
    (i) The transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,
    (ii) potential changes in marine ecosystem diversity, productivity, and stability, and
    (iii) species and community population dynamics.

E.  The persistence and permanence of the effects of the dumping.

F.  The effect of dumping particular volumes and concentrations of such materials.

---

**2.** Based on these factors, the EPA Administrator has promulgated criteria to be used in evaluating permits for ocean disposal. 33 U.S.C. § 1412(c). These criteria are found in 40 C.F.R. § 227 et seq. and are to be used by the Corps and the EPA in evaluating all permits. As explained in 40 C.F.R. § 227.1(b), not all of the criteria are applicable in evaluating the disposal of dredged material. Instead, only the criteria found in Subparts A, C, D, E and G and certain parts of Subpart B apply. *See National Wildlife Federation v. Costle,* 629 F.2d 118, 128–31 (D.C.Cir.1980).

G. Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

H. The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and nonliving resource exploitation.

33 U.S.C. § 1412(a). Utilizing these same criteria the EPA is also authorized, but not required, to designate recommended sites for dumping.[3] 33 U.S.C. § 1412(c).

In addition to these criteria, the Corps, in evaluating the disposal of dredged material, is also required to consider the effect of the project on "navigation, economic and industrial development, and foreign and domestic commerce of the United States." 33 U.S.C. § 1413(b). Federal dredging projects are subject to the same scrutiny as private projects and must be judged according to the standards enumerated above as well as those set forth in 33 C.F.R. § 209.145. *See* 33 U.S.C. § 1413(e). Finally, in determining the appropriate location for the ocean dumping, the Act requires that the Corps shall "to the extent feasible, utilize the recommended sites designated" by the EPA. 33 U.S.C. § 1413(b).

*The Ocean Dumping Convention*

The Ocean Dumping Convention was ratified by the Senate in 1973 and took effect on August 30, 1975. The signatories to the Convention agreed to limit the extent of ocean disposal and to study the nature of the waste material as well as its effect on the proposed disposal area and marine resources before allowing future dumping. Congress amended the Ocean Dumping Act in 1974 to include the standards and criteria set forth in the Convention. *See* S.Rep. No.

93–726, 93d Cong., 2d Sess. 1 (1974), U.S. Code Cong. & Admin.News 1974, p. 2792. *Costle, supra* at 121–25.[4]

*The Standard of Review*

■ Deciding whether the Corps and the EPA have carried out their Congressionally mandated responsibilities in this case is not an easy task: Throughout the trial and the formulation of this opinion the Court has kept in mind the strict standard for reviewing an agency's decision. Clearly, this Court has no authority to "second guess" the federal defendants or to substitute its judgment for that of the agencies. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). To the contrary, the Court is limited to deciding whether the agencies have acted within the scope of their authority, whether they considered the relevant factors in reaching their decision, whether there has been a clear error of judgment and whether the necessary procedural requirements have been followed. *Id.* at 415–21, 91 S.Ct. at 823–26. In other words, the Court must decide whether the agencies' actions have been arbitrary and capricious and not in accordance with law. *Camp v. Pitts,* 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973); *See Kleppe, supra.*[5]

■ While the focus of the Court's determination should be on the administrative record prepared by the agencies, *Citizens, supra,* at 420, 91 S.Ct., at 825, the Court must conduct a "substantial inquiry" to see whether the record supports the decision. *Id.* at 415, 91 S.Ct. at 823. In NEPA cases particularly, this inquiry requires the Court to go outside the record to "insure that the information available to the decision-maker includes an adequate discussion of the environmental effects and alternatives." *Coun-*

---

**3.** In making this designation, the EPA Administrator, in addition to the factors listed above, is required to utilize, if feasible, locations beyond the edge of the Continental Shelf. 33 U.S.C. § 1412(a)(I).

**4.** Because the standards and criteria contained in the Ocean Dumping Convention have been included in the Ocean Dumping Act, the Court will not discuss the Ocean Dumping Conven-

tion separately in this Opinion, but will consider it in conjunction with the plaintiffs' Ocean Dumping Act claims.

**5.** As noted in the Fifth Circuit's opinion in *Sierra Club v. Hassell, supra,* however, the standard for reviewing a decision not to prepare an environmental impact statement is one of "reasonableness."

ty of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1384 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Accord, Citizens for Mass Transit, Inc. v. Adams, 630 F.3d 309, 315 (5th Cir. 1980).

In considering this outside information, however, the Court should be "guided by a rule of reason" and should not "fly speck" the administrative records relied on by the agencies. Citizens for Mass Transit, supra at 313. In addition, the Court is not limited to the review of any single environmental document, but may evaluate the entire record of the agency. Get Oil Out, Inc. v. Andrus, 477 F.Supp. 40, 43 (C.D.Cal.1979). Normally, the application of this standard results in upholding the agency's decision, e.g., National Wildlife Federation v. Benn, 491 F.Supp. 1234, 1244 (S.D.N.Y.1980). It does not in this case.

### III.

If it were not for its tragic environmental implications, the designation and use of Site A for ocean dumping could best be described as a comedy of errors.

In 1976, the EPA asked the Corps to provide a list of ocean dumpsites used for the disposal of dredged material on existing Corps projects so that it could formulate a list of areas that could be designated as ocean disposal sites under the Ocean Dumping Act. See 33 U.S.C. § 1412(c). The Corps provided the EPA with a list of sites which included Site A. Based solely on this list and the Corps' representation of historical usage, the EPA designated Site A as an interim disposal site.[6] 42 Fed.Reg. 2462, 2485 (1977); 40 C.F.R. § 228.12. The feder-

al defendants have now admitted that the site had never been used historically and that the statements in the Federal Register concerning its past use were erroneous.

On January 16, 1980, because the EPA had not completed the studies necessary for making a final designation, the interim designation of Site A was extended for three years. 42 Fed.Reg. 3055 (1980). A notice of intent to extend the designation for an additional three years has recently been published in the Federal Register. 47 Fed. Reg. 44122 (1982). In addition, the EPA has recently completed a Draft Environmental Impact Statement suggesting that Site A not be designated as a final disposal site and that the site be extended on an interim basis only for receipt of the spoils from the Corps' ongoing dredging contract. A final decision on these matters has not yet been made.

Based largely on the EPA's designation of Site A as an interim disposal site, the Corps decided to use Site A as the dumping ground for dredged spoils from the Tampa Harbor Project.[7] The first use of Site A as a disposal site began in the Summer of 1980. Between May 18, 1980 and August 14, 1980, the Corps disposed of approximately 629,640 cubic yards of material from Section 4 (remainder) of the Tampa Harbor Project at Site A.[8] Pre-Trial Stipulation 40. From October 15, 1980 to May 25, 1981 the Corps disposed of 382,652 cubic yards of material from the St. Petersburg/Bayboro Harbor on Site A. Pre-Trial Stipulation 66. From November 1981 to March 31, 1982 the Corps disposed of 662,897 cubic yards of material dredged from Cut-G of the 34-Foot Tampa Harbor Project on Site A. Pre-Trial

6. At the same time, the EPA designated another Gulf area as an interim disposal site. This site, known both as Site B and as the inner site, has an area of about 1 nautical mile square and is located approximately 9 nautical miles west of Mullet Key. Unlike Site A, this site had been used historically with approximately 2,000,000 cubic yards of material being dumped on the site between 1969 and 1973.

7. As discussed in more detail, infra, the Corps stated in a series of evaluation reports prepared pursuant to the Ocean Dumping Act that it had

chosen Site A because it had been designated by the EPA. Defendants' Exhibit 42, 81 and 96.

8. Because of the size of the project, the Tampa Harbor deepening project was divided into several different segments. The section references, e.g., Section 4 (remainder) describe the part of the channel being dredged. A map of these different sections and their respective locations has been marked as Defendants' Exhibit 259. The St. Petersburg/Bayboro project is technically a different project than the Tampa Harbor Project.

*Stipulation 76.* From February of 1981 to May 4, 1982, the Corps disposed of 1,212,453 cubic yards of material from Section 3 (remainder) *Pre-Trial Stipulation 42.* Since May of 1981, the Corps has disposed of approximately 1,800,000 cubic yards of material from Section 2C (portion) on Site A. *Defendants' Exhibit 351.* The end result of these separate dumping activities has been the disposition of approximately 4.4 million cubic yards of dredged material on Site A in the last two years. As of December 1, 1982, approximately 1,245,000 cubic yards of material from Section 2C (portion) remained to be dumped on Site A. The dredging and disposal of this remaining material is to be accomplished by Bohemia, Inc., a private dredging contractor hired by the Corps.

On October 27, 1982, the Corps issued an Environmental Assessment and Finding of No Significant Impact [FONSI] concerning the dumping of the remainder of Section 2C (portion) at Site A.

*The Case Against the EPA*

The EPA concedes that they knew nothing about Site A and that the sole reason it designated Site A as an interim disposal site, i.e., historical usage, was in error. However, the agency contends that it did not have to know anything about the site before it made the designation. In support of this contention, EPA cites the District of Columbia Court of Appeals decision in *National Wildlife Federation v. Costle, supra.* In that case, the Court held that the EPA could designate "interim" disposal sites under the Ocean Dumping Act without making site specific surveys. Significantly, however, the EPA represented to the Court that these interim designations were based on historical usage. Thus, the *Costle* Court was not confronted with, and did not decide, whether the EPA had the authority to designate "interim" disposal sites that had never been used historically and that the agency knew nothing about. In addition, the Court was careful to limit the scope of its holding to the 1977 regulations. Specifically, the Court noted that since the "1980 amendments were not before the District

Court, and are not before us for our review in this appeal, we express no opinion as to their validity under the Ocean Dumping Act or any other statute." *Costle, supra* at 126 n. 25. Consequently, contrary to the defendants' argument, the *Costle* decision does not require a finding that the EPA's interim designation of Site A was proper or lawful.

■ EPA makes the alternative argument that even if it was required to know something about Site A before the site was designated, it has now fulfilled its duty by preparing an environmental impact statement on the site. A draft of this EIS was issued in November of 1982 and recommends the designation of a new site, Site 4, as a final disposal site. It also recommends that Site A only be used for the dumping of the 1,245,000 cubic yards of material remaining in the Corps' present dredging contract. Because no final decision has been made on these recommendations, the EPA asserts that there is no administrative decision ripe for review. The Court agrees that a decision about the future use of Site A is not in a posture to be reviewed. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

*The Case Against the Corps*

■ The defense of "ripeness", however, cannot be used to shield the Corps' actions from review. The purpose of the ripeness doctrine is to "protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott, supra* at 148–49, 87 S.Ct. at 1515–16. It is hard to imagine a more "concrete effect" than the disposal of 4.4 million cubic yards of material and the scheduled disposal of an additional 1.2 million cubic yards. Clearly, the Corps' decision to use Site A is "ripe" for review.

In defending the Corps' actions with respect to Site A, the defendants point to the extensive administrative record as proof of the Corps' good faith analysis. If sheer

volume were determinative, the defendants' administrative record would clearly be found to be sufficient. Unfortunately, that is not the controlling standard. Instead, the Court must decide whether the record evidences a "hard look" at the consequences of the action and sufficiently explains the pertinent environmental influences involved. *Isle of Hope Historical Association, Inc. v. U.S. Army Corps of Engineers,* 646 F.2d 215, 220 (5th Cir.1981).

In order to make this determination, it is necessary to understand something about Site A and the environmental factors the plaintiffs believe have not been considered.

Site A is located approximately 13.3 nautical miles west of Mullet Key in the Gulf of Mexico. The site has an area of roughly .68 nautical miles square and had an approximate depth, prior to dumping, of about forty-five to fifty feet.

The plaintiffs established at trial that Site A contained some hard bottom communities prior to the dumping.[9] Testimony of Dr. Rice, Walter Jaap and Bruce Myers, *Plaintiffs Exhibit 47.* Hard bottom communities consist of hard and soft corals and sponges that attach to the exposed limestone shelf, i.e., the "hard bottom", in the area of the Gulf outside of Tampa Bay. Testimony of Walter Jaap, Dr. Edwin Keppner. These hard bottom communities are diverse and highly productive areas supporting a number of different marine species. *Plaintiffs Exhibit 47; see Defendants' Exhibit 195.* They provide a particularly important habitat for grouper and snapper; fish which have recreational as well as commercial importance. Testimony of Conner Davis, *Plaintiffs' Exhibit 83.*

Although randomly interspersed in the area of the Gulf from Sarasota to Tarpon Springs, hard bottom communities represent a relatively small percentage of the ocean floor. Testimony of Walter Jaap, Dr. Taylor.[10] Moreover, their importance is especially significant in areas within 60 miles offshore because this region is already considered to be a stressed area for fishing. Testimony of Conner Davis. Consequently, the credible evidence at trial was all to the effect that care should be taken not to destroy hard bottom habitats in this region of the Gulf.[11]

The plaintiffs also established that there were hard bottom communities in close proximity to Site A. Testimony of Dr. Rice, Walter Jaap. In addition, the plaintiffs have shown that there is a unique hard bottom area, commonly known as Larry's Ledge, which is within one mile of Site A. Testimony of Lawrence Borden, Captain Berry, *Plaintiffs' Exhibit 47.* This limestone ledge has a relief of 1–4 meters and a length of at least ½ mile. *Plaintiffs' Exhibit 47.*

The plaintiffs contend that the dumping has destroyed hard bottom areas within Site A and has adversely affected, if not destroyed, surrounding hard bottom communities. They fear that continued dumping will exacerbate the present damage and will extend the harm to new areas. In particular, the plaintiffs are concerned that the material that has already been dumped is leaving Site A, causing burial and chronic siltation of hard bottom communities within

---

9. Although many of the reports and witnesses referred to "reefs," these references are to hard bottom ledges and should not be confused with the reef-forming corals found in the Florida Keys and the Middle Grounds.

10. One of the plaintiffs' witnesses, Walter Jaap, a corals biologist employed by the State Department of Natural Resources, testified that from 5%–30% of this area of the Gulf is hard bottom. One of the defendants' experts, Dr. Taylor, testified that hard bottom constituted only 1%.

11. The defendants attempted to prove that soft bottom communities are also important to the marine resource. While there is no doubt that they are, there is also no doubt that hard bottom and limestone reef communities are highly productive areas which should not be destroyed. For example, the Gulf Coast Fisheries Management Council has issued a fisheries management plan that opposes the destruction of any hard bottom habitats. Similarly, the State Department of Natural Resources has an active artificial reef program aimed at creating additional reef areas in the Gulf.

three square miles of the center of the site.[12]

The plaintiff's expert testified that burial would kill corals and sponges and that chronic siltation could kill them or could retard their growth and reproduction. Testimony of Walter Jaap. The plaintiffs' witnesses also testified that turbid water has an adverse impact on scuba diving and spear fishing. Testimony of Bruce Myers, Lawrence Borden.

At trial, the defendants argued both that the plaintiffs had not proven their claims concerning the environmental consequences of dumping at Site A and that all significant environmental consequence had been considered by the agencies and reflected in their records.

The defendants' first contention is belied by the administrative record and by the defendants' own witnesses. The presence of hard bottom communities in and around Site A was brought to the Corps' attention as early as September 5, 1980 by Interstate Electronics Corporation, a contractor employed by EPA to prepare an EIS on an open water disposal site in the Gulf. *Defendants' Exhibit 106.* The letter stated in pertinent part that IEC believed that Site A "overlies, or is in close proximity to, the highly productive and diverse limestone reef community which lies in the 10–30M depth range of this region of the Florida shelf, and would be unacceptably impacted by dredged material disposal." [13] The presence of nearby hard bottom communities is also corroborated by Dr. Taylor's 1982 report. *Defendants' Exhibit 240.*

The ecological importance of hard bottom areas is recognized in the administrative record, *Defendants' Exhibit 195 at 3,* and in the EPA's Draft Environmental Impact Statement, *Plaintiffs' Exhibit 82.* One of the defendants' experts, Dr. Keppner, also recognized their importance and the need for preserving them.

The administrative record also contains a report prepared by a Corps' employee which states that siltation from Site A would probably affect an area three square miles around the site. *Defendants' Exhibit 195.* The existence of massive siltation from the site was also corroborated by one of the Corps' expert witnesses.[14] Dr. Bokuniewicz testified at trial that recent bathymetric surveys revealed that between 30% and 70% of the 4.4 million cubic yards of material already dumped on the site had been dispersed. He was not sure where the materi-

---

**12.** The plaintiffs also alleged that the Corps was dumping toxic materials on the site. They based this allegation on initial testing done by the Mote Marine Laboratory which indicated that potentially dangerous levels of heavy metals were present on the site. The plaintiffs also produced former employees of Jones, Edmunds & Associates, the Corps' contractor that ran bioassay tests on sediments in the St. Petersburg/Bayboro Harbor, who testified that new sediment samples were taken from Bayboro because the first samples flunked the tests. The Corps' expert, Dr. Engler, testified that it is proper scientific procedure to take new samples if the original samples were not representative of the area to be dredged. He also testified that the bioassay tests run by Jones, Edmunds were properly performed and that the sediments were suitable for ocean disposal. The Court will defer to the Corps' interpretation of this data and the procedures in the Implementation Manual. *Accord, National Wildlife Federation v. Benn,* 491 F.Supp. 1234 (S.D.N.Y.1980).

**13.** Although IEC requested a meeting with the Corps to discuss alternative sites, no memorandum of such a meeting is contained in the administrative record. In fact, the only mention of the IEC report seems to be an oblique reference to EPA's ongoing studies in an undated Fact Sheet marked as *Defendants' Exhibit 115.* In a letter to the EPA dated November 7, 1980, IEC made similar recommendations and reported that observations made during the Antelope survey "indicate a reef is located very near [Site A]." *Plaintiffs' Exhibit 49.*

**14.** At trial, the defendants also called Dr. Charles Holmes to testify about siltation occurring in and around Site A. He also explained the geological character of the Tampa Bay area of the Gulf. Dr. Holmes opined that the flushing of silt from Tampa Bay may be the source of silt found in sediments near Site A and that heavy siltation is not uncommon in this general area. This opinion was refuted by the plaintiffs' rebuttal expert, Dr. Doyle. More importantly, however, a scientist employed by the Corps in 1979 to survey Site A found only a 1% silt content at the actual site. It should also be pointed out that Dr. Holmes' opinions are not included in the administrative record upon which the Corps relied in making its decision.

al went or where material dumped in the future would go, although he thought it likely that a 20km square area surrounding the site would be blanketed with a thin, uneven layer of silt. He also posited that material would leave the site any time waves exceeded 6.6 feet and that the amount of material leaving the site would increase exponentially with higher waves.[15]

The defendants' first argument, i.e., that the plaintiffs have not shown the environmental consequences of dumping at Site A, is not only undercut by the facts, it is also based on an erroneous legal premise. The defendants argue that the plaintiffs have not established that the dumping has caused any significant environmental harm. In particular, they complain about the plaintiffs' lack of pre-disposal, baseline data and their inability to prove that the siltation which has been found on Larry's Ledge and other hard bottom areas came from Site A. Significantly, however, the defendants cannot disprove the plaintiffs' claims. They have no comprehensive baseline data from which to work. They also do not know how fast silt is leaving the site or whether it is adversely affecting Larry's Ledge.[16] They also do not know what effect the dumping has had or will have on the water quality or recreational use of neighboring areas. The answers to these questions are not just "nice to know." They are required by the Ocean Dumping Act.[17]

While a failure to do a site specific survey might be reasonable under NEPA is some cases, the need for a site specific survey of the disposal site is a requirement under the Ocean Dumping Act.[18] For example, the Act and its implementing regulations require the evaluation "on an individual basis" of the impacts of dumping on "esthetic, recreational and economic values." 40 C.F.R. § 227.17. In making this determination, the defendants are specifically required to evaluate several site-specific factors. For example, 40 C.F.R. § 227.18, in pertinent part, requires the defendants to consider the following factors:

> (a) Nature and extent of present and potential recreational and commercial use of areas which might be affected by the proposed dumping; (b) Existing water quality, and nature and extent of disposal activities, in the areas which might be affected by the proposed dumping; . . . (d) Visible characteristics of the materials (e.g., color, suspended particulates) which result in an unacceptable estetic [sic] nuisance in recreational areas . . .

There is no discussion in the administrative record concerning these factors as they relate to Site A.

In support of the defendants' second argument, i.e., that they did take a "hard look" at all significant environmental consequences of dumping at Site A, the defend-

---

**15.** Dr. Bokuniewicz based his opinion on the assumption that waves greater than 6.6 feet occur in this area of the Gulf from 1%–5% of the time. In rebuttal, the plaintiffs' expert Dr. Van de Kreeke testified that the most reliable data indicated that waves greater than 6 feet occur 48 days per year and waves greater than 7 feet occur 20 days per year. Dr. Van de Kreeke's opinion was corroborated by another of the plaintiffs' witnesses, Capt. Berry, who testified that he had observed bad weather conditions in this area of the Gulf on 58 days in 1978, 76 days in 1979, 81 days in 1980, 71 days in 1981, and 39 days in 1982. Approximately eighty-five percent of the time, the bad weather conditions noted by Capt. Berry were accompanied by seas higher than 6 feet.

**16.** The EPA conducted a survey of Site A in May of 1982. Using the EPA vessel, *The Antelope,* EPA scientists took samples from the site

and made a videotape of the disposal area. However, even though one of the plaintiffs' major arguments concerns the effect of dumping on neighboring areas, no videotaping was done beyond the boundaries of the site. *Testimony of Jonathan Amson.*

**17.** The plaintiffs, of course, retain the burden of proving that the administrative record is inadequate. *Isle of Hope v. U.S. Army Corps of Engineers, supra* at 220.

**18.** The Ocean Dumping Act does not require an EIS to be done prior to open water disposal. However, the Act does require that certain factors be evaluated before dumping is allowed. Thus, the Act and the regulations provide guidance on environmental factors that should be considered in any EIS prepared for major federal disposal projects.

ants point to the Final and Supplemental Environmental Impact Statements [FEIS and SEIS] which were prepared for the Tampa Harbor Project. They also cite the Finding of No Significant Impact [FONSI] issued by the Corps on October 27, 1982 as proof of their continued study of the site.

*The FEIS and SEIS*

■ The defendants argue that the FEIS and SEIS sufficiently discuss the general consequences of ocean dumping and that NEPA does not require a site specific environmental impact statement if a broad-based study has been completed which includes the site at issue. *Kleppe v. Sierra Club, supra* at 414, 96 S.Ct. at 2732; *Badoni v. Higginson,* 638 F.2d 172, 180–81 (10th Cir.1980). However, the cases cited by the defendants all involved situations in which the characteristics of the challenged site were the same as those of the studied area. In none of these cases was there any showing that the environmental impacts discussed in the EIS were different than those expected in the area at issue. *E.g., Ventling v. Bergland,* 479 F.Supp. 174, 180 (D.S. D.1979). In contrast, the plaintiffs in the instant action have shown that the effects of dumping at Site A, in particular, and in the open waters of the Gulf, in general, are different than the effects considered in the FEIS and the SEIS. The FEIS is a 145-page document which describes the environmental impacts and alternatives involved in the construction of the Tampa Harbor deepening project. The FEIS identified four types of disposal sites: spoil islands, open waters bordering the shipping channel in Tampa Bay, open waters in the Gulf of Mexico and Gulf beaches. The FEIS identified two open water disposal areas, one near the entrance to Tampa Bay and one approximately seven miles west of Mullet Key. Site A was not mentioned or identified. In addition, according to the FEIS, the only material to be dumped in Gulf waters was 80,000 cubic yards annually of maintenance dredging.

In their pre-trial brief, the federal defendants have identified the portions of the FEIS which they believe are applicable to disposal of materials in Gulf waters. *Defendant's Pre-trial Memorandum, Attachment A at 1–3.* The following portions of the FEIS are cited: 25–27, 32–33, 64–65, 139 and Appendix B. Alternatives to open water disposal are found at pages 141–42. The pages cited generally discuss the types of sediments and their characteristics. The clear emphasis of these pages and, in fact, the entire FEIS is on the Tampa Bay Harbor and estuary. There is little, if any, discussion of the Gulf or its marine environment.

In a footnote, the defendants state that the cited discussion is applicable to Gulf waters. However, no authority is offered in support of this statement. The defendants also state that the discussion of the biological effects of spoil disposal on marine life is applicable to disposal in the Gulf. Curiously, in support of this statement the defendants cite numerous letters from individuals in the community protesting the project and warning of its effects on fishing.

The defendants' position that the FEIS adequately discusses the environmental consequences of dumping at Site A is undercut in other ways. First, the Corps has admitted that it did not site specific studies of Site A or the surrounding area in preparing the FEIS. Although the Corps hired a biologist to survey the area, his study was confined to taking samples from the Tampa Harbor Shipping channel. Significantly, the biologist who conducted this study, Dr. Taylor, testified at the trial and stated on cross-examination that it was not possible to determine anything about Site A from the study he conducted in preparation for the FEIS.

Next, the FEIS itself states that the locations of the disposal sites were not known at the time the FEIS was prepared. As a result, the FEIS advised that "biological evaluation[s] will be made of the proposed spoil disposal areas so that exceptionally productive sites might be avoided when the exact disposal boundaries are clearly defined." *Defendant's Exhibit 5 at 128.* Similarly, the FEIS states a number of

times that the disposal sites are not known and that the FEIS does not represent "a final comprehensive plan." *Defendant's Exhibit 5 at 170, 193, 199–200.*

The Supplemental Environmental Impact Statement was issued in 1977. *Defendants' Exhibit 10.* The SEIS presented a revised plan altering the design, size and location of areas in the FEIS. *Pre-Trial Stipulation 15.* The SEIS indicated that one of the Gulf disposal sites MD/A–9 (i.e. Site A) would be located approximately 13.3 nautical miles west of Mullet Key. However, the effect of the relocation on the marine environment was not discussed. To the contrary, the SEIS stated with regard to Site A that "there would be no change from the design plan in the final EIS." *Defendants' Exhibit 10 at 2.* The change in location was explained as "an additional precaution against the possibility of dredged material drifting into the channel after placement." The Corps has admitted that no site specific survey of the area was done in preparing the SEIS. *Pre-Trial Stipulation 104.*

Neither the FEIS nor the SEIS discuss the relative importance of hard bottom habitats or whether the destruction of hard bottom areas at Site A will have a significant or detrimental impact on the environment. They also do not address many of the specific factors listed in the Ocean Dumping Act or its regulations. *See* 40 C.F.R. § 227.17 et seq.

*The October 27, 1982 FONSI*

The FONSI issued on October 27, 1982 states that dumping on Site A of the remaining 1,245,000 cubic yards of material from Section 2C will not have a significant impact on the environment and that a detailed environmental impact statement is not required. *Defendants' Exhibit 270.*

Specifically, the Corps found:

1. that the disposal of material dredged from Section 2C (portion), 4 (remainder) and 3B on Site A was not a "substantial change in the project which was relevant to environmental concerns."

2. that no significant new information relevant to environmental concerns has been presented to the Corps concerning the Corps' disposal of the material dredged from these sections at Site A.

3. that the action will not have a significant impact on the quality of the human environment, and

4. that a second supplement to the final EIS is not required.

The FONSI also states that "the study area is homogeneous in character with no unusual topographic features of general or scientific interest."

In making these findings, the Corps relied on an environmental assessment issued simultaneously with the FONSI. *Defendant's Exhibit 269.* In pertinent part, the assessment discusses the characteristics of the material that has and will be dumped, the need for the Tampa Harbor deepening project, the lack of any alternative disposal sites for dredged spoils from the project, and the environmental impacts of continued disposal at Site A. In particular, the assessment states that disposal at Site A will destroy the benthic or bottom dwelling marine life at the site but that the site will probably recover within a 9 to 10 year period after the bulk of the fine sediments dumped on the site have dispersed. The assessment also states that, with the exception of some hard bottom areas near the perimeter of the site, the area is a "rather featureless sandy habitat." Finally, the assessment concludes that all sediments dumped at the site are suitable for ocean disposal and that there is no convincing evidence to indicate that heavy metals dumped on the site would be biologically available.

The issue before the Court is whether these conclusions reflect an objective "hard look" at the environmental consequences of the dumping and whether, based on the record, the Corps' decision not to prepare a supplement to its FEIS was reasonable. *Sierra Club v. Hassell,* 636 F.2d 1095 (5th Cir.1981).

A starting point for this analysis is the bibliography attached to the assessment which appears to list the materials the Corps relied on in making its findings. The bulk of these materials were included in the administrative record submitted by the Corps. For the ease of analysis, the materials will be discussed in the Order in which they appear in the bibliography. The first entries in the bibliography, the FEIS and the SEIS, have already been discussed.

*1979 Public Notice*

This public notice, *Defendants' Exhibit 36,* advised the public that approximately 400,000 cubic yards of material from the St. Petersburg/Bayboro Harbor would be dumped on Site A.

*1979 Section 103 Evaluation Report*

This report, *Defendants' Exhibit 42,* identified the site, stated that bioassays results indicated that the material to be dumped was environmentally acceptable and briefly stated that the project was not expected to cause adverse impacts to the environmental factors listed in the Ocean Dumping Act. Significantly, the report states that "[t]he particular ocean disposal site was chosen because it is approved by the EPA."

*1979 Environmental Assessment*

This assessment, *Defendants' Exhibit 43,* states that the disposal of material on Site A will destroy the benthic organisms at the site and will cause temporary water degradation. The assessment states further that the material is suitable for dumping and that the dredging project will benefit the general area.

*1980 Finding of Fact*

This finding of fact, *Defendants' Exhibit 115,*[19] also involves the dredging of approximately 400,000 cubic yards of material from St. Petersburg/Bayboro Harbor and the disposal of it on Site A. The findings describe the project and its need. They also state that there is no indication that the dumping will have any long-term environmental im-

pact, noting that approximately 4.5 million cubic yards of material had been dumped in the Gulf during the last thirty years with no reported adverse effects. The report also states that there is no-known reef-forming coral in the area of the disposal site. Finally, the report notes that the EPA's consulting firm is in the process of studying the impact of dredged materials in the Gulf and that it had recommended that the disposal site limits be shifted in a southerly and westerly direction.[20]

*1980 Section 103 Evaluation Report*

This report, *Defendants' Exhibit 81,* discusses the disposal on Site A of 2,330,000 cubic yards of material from the channel between Cut F and Gadsen Point Cut. The report states that the material had been tested and found suitable for ocean disposal. It also briefly states that no adverse impacts to the environmental factors listed in the Ocean Dumping Act are expected. As in *Defendants' Exhibit 42,* the report states that "[t]he particular ocean disposal site was chosen because it is approved by EPA."

*1980 Section 103 Evaluation Report*

This report, *Defendants' Exhibit 96,* deals with the disposal at Site A of approximately 3,000,000 cubic yards from Cuts A and B and approximately 570,000 cubic yards from Cut G. Once again, the environmental factors are summarized and the choice of the particular dumpsite explained as being because "it is approved by EPA."

*1980 Public Notice*

This public notice, *Defendants' Exhibit 64,* advises the public of the proposed disposal of materials from Cut G.

*1981 Review of a Technical Report*

This report, *Defendants' Exhibit 195,* is an in-house review of a technical report entitled "An Ecological Study of the Effects of Offshore Dredge Material Disposal with Special Reference to Hard Bottom Habitats in the Eastern Gulf of Mexico." The technical report was prepared by the

---

19. The same fact sheet appears as Exhibit 116 and 158. Exhibit 115 is apparently the rough draft.

20. This reference to an EPA report apparently refers to the work being done by Interstate Electronics Corporation. *See Defendants' Exhibit 106; Plaintiffs' Exhibit 38.*

Mote Marine Laboratory in Sarasota, Florida. The report, commonly referred to as the Mote Report, was commissioned by the plaintiffs in this lawsuit and was submitted to the federal defendants for their information and review in August of 1981.

The review states in pertinent part that: The MML report leaves no basis for doubt that the 0.56 square mile disposal site, with its patch reef flora and fauna, has been covered with dredged sediment and will continue to be covered if the site remains in use. An additional square mile was evidently affected, according to the report, and an additional 1.5 miles around the site may be affected by future disposal operations. The importance of patch reef communities is presented in the MML report.

The reviewer, however, took issue with the Mote Report's conclusion on the toxicity of the sediments being dumped at the site and found that there was no evidence that any heavy metals present in the material were biologically available.

The reviewer concluded: The MML report recommendations for studies to find a disposal site which will not result in physical damage to patch reefs is well taken. However, stopping construction projects which require use of the presently designated disposal site until a new site is found involves balancing the value of approximately 3 square miles of ocean bottom containing patch reefs with the values associated with the navigation projects.

The value of approximately three square miles of ocean bottom containing patch reefs was not discussed.

*1981 Environmental Assessment and FONSI*

These documents, *Defendants' Exhibit 191,* discuss the effects of dumping approximately 600,000 cubic yards of material on Site A from Cut G. The assessment is a twelve page document which discusses the physical and biological characteristics of the Tampa Bay estuary and the sediments which were to be dredged. The assessment states that the benthic organisms at Site A will be destroyed by the dumping and that turbidity will increase during dredging and disposal. The assessment, however, stated that none of the adverse effects would be major or permanent.

*1981 Finding of Fact*

This document, as identified, is not included in the administrative record submitted by the defendants.

*Transcript of Hearing on June 30, 1981*

The transcript, *Defendants' Exhibit 156,* is of a public hearing on the continued use of Site A. At the meeting, Corps representatives gave a brief description of the project and took statements from individuals in favor of and in opposition to the continuation of the project. In particular, the Corps representative at the hearing stated that the Corps had decided to use Site A as opposed to other open water disposal sites within the Gulf and Bay because the fine nature of the sediments made them likely to flow back into the shipping channel.

*Letters from Mathis to Saunders*

These letters, *Defendants' Exhibit 254,* are between the EPA and the Corps. They advise the Corps of the expiration of Interstate Electronics Corporation's contract with the EPA and EPA's completion of the study of potential and existing open water disposal sites in the Gulf.

*Letter from Garland*

This letter, *Defendants' Exhibit 80,* transmits the Section 103 Evaluation Report for Eastern Half of the Widener Between Cut F and Gadsen Point. This 103 Report has been previously discussed. *Defendants' Exhibit 81.*

*1982 Biological and Bathymetric Investigations of a Proposed Offshore Disposal Site in the Gulf of Mexico*

This report, *Defendants' Exhibit 230,* was prepared under Corps' contract by Conservation Consultant's, Inc. The report summarizes the data obtained in a survey of a proposed offshore disposal site. The site surveyed was not Site A. The report notes the value of hard bottom habitats.

*Environmental Science and Engineering Bioassay Analysis*

This report, *Defendants' Exhibit 41,* contains the results of bioassay testing done on material to be dredged from the Tampa Harbor project and dumped on Site A. The report states that the sediments are acceptable for ocean dumping.

*1980 Task of Ocean Waste Disposal Sites*

This report, *Defendants' Exhibit 114,* was prepared by Interstate Electronics Corporation. It catalogues the existing ocean disposal sites within the jurisdiction of the Jacksonville District of the Corps. Site A is shown on a map enclosed in the report. Curiously, unlike the other disposal areas listed, there is no discussion of the Tampa ocean disposal sites or their characteristics.

*1980 Results of Bioassay Analysis*

This report, *Defendants' Exhibit 92,* was prepared by Jones, Edmunds and Associates and reports that the sediments taken from St. Petersburg/Bayboro Harbor passed their bioassay tests.

*The Mote Report*

This report, *Defendants' Exhibit 195,* was the subject of the review described above. *See Defendants' Exhibit 196.* The report summarizes the data obtained by the Mote Marine Laboratory at Site A. In particular, the investigators reported the burial by sediments of several living hard-bottom communities within the site and the effects of siltation as far as one mile from the site. A ledge with relief of from 1–4 meters and a length of at least one half mile was observed one mile west of the site. Siltation of the coral and sponge community living on this ledge was also observed. The report also stated that potentially harmful levels of zinc, lead and cadmium were present at the site.

*1982 Biological Information Report Permit Application*

This report was not included in the administrative record submitted by the defendants.

*1979 Taylor Report*

In 1979, prior to any dumping at Site A, the Corps hired Dr. John Taylor to survey the site. This report, *Defendants' Exhibit 31,* summarizes Dr. Taylor's findings. Dr. Taylor took nine sediment samples from the site. He took one from the center of the site, one from each corner, and one from the middle of each side of the site. Dr. Taylor reported that no ledge or hard-bottom communities were observed while diving at Site A. However, he stated that "it is important to emphasize that this area of the Gulf is heavily fished for bottom species, such as grouper, that feed on a variety of bottom dwelling invertebrates." He also recommended, if no alternative sites could be found, that disposal operations occur between December and March to minimize the effects on the benthos.

*1982 Taylor Report*

In 1982, the Corps hired Dr. Taylor to do a follow-up survey of Site A. His report, *Defendants' Exhibit 240,* summarizes his findings. Dr. Taylor studied both Site A and Site B. Dr. Taylor used the same nine-station, sediment collection method of study that he had used in his 1979 study. He reported general shoaling over much of Site A and a reduction in the abundance and diversity of infauna where fine sediments had accumulated. He also reported that the dumping may have had both beneficial and detrimental effects at the site. Specifically, although Dr. Taylor reported a decrease in the total number of organisms collected in 1979, the numbers and kinds of organisms in some sections of the site had increased since the dumping. Dr. Taylor also reported that Site B appeared to have recovered since the cessation of dumping at that site a decade earlier. Dr. Taylor found no evidence of hard bottoms at Site A, but reported that some hard bottom communities were located near the site to the north and west.[21] Finally, he recommended that the dumping operations be moved from Site A to some other location to give the site a chance to recover and to avoid damage to the "sensitive hard bottom nearby."

---

**21.** Dr. Taylor noted that visibility during the 1979 survey was 10–15 feet and 20–30 feet in 1982. As noted above, Site A is about .68 nautical miles square.

*1982 Draft Regional Environmental Impact Statement*

This report was not included by the defendants' as part of the administrative record.

*1977 Ecological Evaluation of Proposed Discharge of Dredged Material Into Ocean Waters*

This report, *Defendants' Exhibit 273,* is a detailed study of the effects of dredged material disposal generally. It also outlines the procedures to be used in testing dredged materials to determine their suitability for ocean disposal.

*1980 Letter from Arthur P. Linton, EPA*

This letter, *Defendants' Exhibit 100,* advises the Corps that the material to be dredged from Cut G is suitable for ocean disposal.

*Tampa Bay Reconnaissance Survey*

This report, *Plaintiffs' Exhibit 41,* summarizes the results of a survey of three alternative ocean disposal sites in the Gulf. The survey did not study Site A. It does, however, generally discuss the characteristics of the Eastern Gulf.

Many of the studies and reports outlined above are of the "fill in the blank" variety and merely repeat the information contained in earlier reports. Significantly, there are no studies discussed in the FONSI or the Environmental Assessment which concern the nature, quantity and effect of siltation from Site A.[22] In addition, although the review of the Mote Report admits that a large area around Site A has been and will be damaged, there is no analysis of the relative environmental impact. Similarly, although IEC advised the Corps that dumping at Site A was environmental-

ly unacceptable, the administrative record does not explain why IEC's recommendations were not accepted or heeded. There is also no evaluation of many of the site specific factors listed in the Ocean Dumping Act.[23] For example, the effects of dumping on Larry's Ledge, an established recreational area, has not been determined. *Cf.* 40 C.F.R. § 227.17–18.

The Corps' studies also fall short by failing to consider the cumulative effect that 1,245,000 million cubic yards of material will have on an area that already contains 4.4 million cubic yards of material. The Ocean Dumping regulations require the defendants to consider the quantity of the material to be dumped. 40 C.F.R. § 227.9. In addition, NEPA requires an agency to consider the cumulative impacts of its actions and not to segment its projects in order to escape NEPA's procedural requirements. *Natural Resources Defense Council v. Callaway,* 524 F.2d 79 (2d Cir.1975); *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974). Thus, if proposed actions will have "cumulative or synergistic environmental impact[s], ... their environmental consequences must be considered together." *Kleppe, supra* at 410, 96 S.Ct. at 2730. The defendants argue that the individual dumping projects were not so "interdependent" that they required a consideration of cumulative impacts. *See Sierra Club v. Callaway.* The defendants' position is indefensible on the facts of this case. It cannot be gainsaid that dumping several million cubic yards of material on the same spot will have a "cumulative or synergistic" effect.

In sum, the Corps' decision that an EIS is not required for the remaining 1,245,000

---

**22.** At the time the FONSI was issued, the data from the bathymetric surveys was not available. In addition, although Dr. Bokuniewicz has recently prepared a report on sediment transportation in and around Site A, the defendants objected to the introduction of the report or any specific questions concerning its contents. It should also be noted that the letter advising Dr. Bokuniewicz of the amount of material dumped on Site A was not even sent until October 25, 1982, two days before the FONSI was issued. *Defendants' Exhibit 351.*

**23.** The plaintiffs also alleged that the Corps did not issue public notices on the project as required by the controlling regulations. The defendants admit that the public notice regulations were not followed but argue that these errors were cured after this case was filed. Although the subsequent remedy of these failures makes the plaintiffs' request for relief moot as to this claim, it bolsters the conclusion that the Corps did not take a "hard look" at the environmental consequences of their proposed actions while making their decision.

cubic yards of remaining material is not reasonably supported by the administrative record submitted to this Court. In addition, the Corps' failure to mention or study many of the specific factors listed in the Ocean Dumping regulations is arbitrary and capricious and not in accordance with law. Finally, the Corps' use of Site A because it is designated as an interim dumpsite by the EPA can not be used to justify their actions since the EPA knew nothing about the site.

## IV.

Having decided that statutory violations did occur, the question becomes what remedy is appropriate. This Court has broad discretion in deciding whether the plaintiffs are entitled to an injunction. *Weinberger v. Romero-Barclero,* —— U.S. ——, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In deciding whether an injunction is appropriate in this case, the Court has looked to the four prerequisites for the issuance of a preliminary injunction. They are: (1) whether the movant will prevail on the merits, (2) whether the movant will suffer irreparable injury if the injunction is not granted, (3) whether the threatened harm to the movants outweighs the threatened harm to the party to be enjoined and (4) whether granting the injunction will disserve the public interest. *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185 (5th Cir.1982).

■ The plaintiffs have succeeded on the merits. They have also shown that continued dumping at Site A will irreparably damage the hard bottom communities in the vicinity of Site A. In particular, the plaintiffs established that Larry's Ledge is a unique area of general and recreational interest and that it is endangered by the dumping. Although the defendants' expert, Dr. Taylor, opined that Site A might recover in nine to ten years, the plaintiffs'

experts gave considerably longer estimates. Recovery also does not mean a return to the area as it was before dumping. According to the plaintiffs' expert, Walter Jaap, many of the corals endangered by the dumping are decades old.

The defendants argue that the plaintiffs are not entitled to injunctive relief even if the Corps should have completed an EIS prior to dumping because the EPA has now completed such a study.[24] In support of this argument, the defendants note that NEPA and the Ocean Dumping Act are not punitive statutes and that they do not authorize a Court to punish an agency for past transgressions if these errors have subsequently been cured. *Accord, Weinberger v. Romero-Barcelo, supra.* *See Realty Income Trust v. Eckerd,* 564 F.2d 447, 456 (D.C.Cir. 1977).

The main problem with the defendants' argument is that the defendants consistently objected to any discussion of the Draft EIS because it is part of EPA's ongoing decision-making process concerning the designation of Site A and Site 4. Finding that the decision to use Site 4 was not yet ripe for review, the Court upheld the majority of the defendants' objections and refused to decide the adequacy of the Draft EIS or any ongoing studies.[25] Consequently, the Draft EIS cannot be used to bar the plaintiffs' requested relief.

Moreover, although the adequacy of the Draft EIS and the propriety of EPA's proposals is not now before the Court, it should be noted that the EPA does not propose to make Site A a permanent disposal site. To the contrary, the agency proposes to make Site 4 the final disposal site and to only allow the Corps to use Site A for the material to be dredged under its ongoing contract. Furthermore, the Draft EIS does not necessarily endorse continued dumping

---

**24.** In addition, the defendants have raised the defense of laches. The defendants have made absolutely no showing that the plaintiffs are barred by laches. Although the plaintiffs did not actually file the lawsuit until 1982, they advised the Corps of their opposition long before that time and had actively tried to negotiate a resolution of their claims during the year

and a half prior to filing the lawsuit. *Cf. Save Our Wetlands, Inc. v. United States Army Corps of Engineers, et al.,* 549 F.2d 1021 (5th Cir.1977).

**25.** The Court, however, did allow the plaintiffs to introduce the Draft EIS into evidence.

at Site A. Instead, the study warns that "[s]hort-term use of the Existing Sites [Site A] ... may significantly impair long-term productivity through burial and siltation of hard-bottom areas around these sites." *Plaintiffs' Exhibit 82 at 4–23 to 4–24.*

The defendants' argument also fails to take into account the fact that the Corps is required to make its own evaluation of disposal at Site A. *See* 33 U.S.C. § 1412. It might be that the Corps will not accept the EPA's data or that it might draw different conclusions from it. The relative environmental and economic costs of the project might also be changed by the study's findings.

> By requiring an impact statement, Congress intended to insure that all agencies consider the environmental impact of their actions in the decision-making process. The contents of the statement are designed to insure that the effects of the project do not go unnoticed.

*South Louisiana Environmental Council, Inc. v. Sand, et al.,* 629 F.2d 1005, 1010 (5th Cir.1980) (citations omitted). Here, the Corps has made their decision and they want to support it with a report that was issued after their decision was made. The Supreme Court noted in *Citizens to Preserve Overton Park v. Volpe,* that " 'post-hoc' rationalizations ... have traditionally been found to be an inadequate basis for review." 401 U.S. at 419, 91 S.Ct. at 825 (citations omitted). It follows that the Corps can not rationalize their decision by citing a report that they did not rely on in making their judgment.[26]

The defendants also stated that any injunction of the project at this stage would cause serious contractual difficulties and would substantially increase the cost of the project. However, their allegations were not borne out by the evidence.[27]

The Corps' contractor is currently several months behind schedule and is technically in default. The Corps' estimates of the expense of an injunction are all based on the premise that the contractor is not in default. In addition, as plaintiffs' counsel pointed out in closing argument, the total cost of the project depends on how far the dredged material has to be transported. If Site A never should have been selected or used, then the total cost of the project to date is much less than it would have been originally. For these reasons the plaintiffs have shown that an injunction will not cause greater harm to the Corps than to the plaintiffs.

The Tampa Port Authority, an intervening defendant, presented evidence that it would be damaged by any delay in the Tampa Harbor Project. It explained that Tampa will lose business if the project is not completed and that ships leaving the harbor are presently being light-loaded because of the shallow depth of the present channel. The authority's witnesses also stated that a deeper channel will make the harbor safer for navigation. These are serious concerns. However, as noted at the beginning of this opinion, the Corps has admitted that the project will not be completed until Fiscal Year 1985 (i.e., October 1, 1984 to October 1, 1985). Until it is completed and the entire channel is dredged, ships will still be light-loaded and the stated navigation concerns will still be present. Testimony of Col. Devereaux.

Enjoining disposal of Site A should not delay the ultimate completion date of the project. Indeed, there is every indication that a new disposal site, Site 4, will be available for dumping as early as February 1, 1983 and that the Corps could satisfy all the legal requirements for dumping at this site within ninety days.

Finally, the Court finds that the issuance of an injunction will not disserve the public interest. The public has an interest in see-

**26.** The Court, of course, does not mean to imply that the Corps has to duplicate studies made by the EPA or that it cannot rely on the Draft EIS and other relevant information in making its decision. *See National Wildlife Federation v. Benn, supra* at 1248–52.

**27.** Because this matter was heard in camera, the Court will not supplement its findings in this Opinion.

ing that Government officials carry out their responsibilities. It is also appropriate to note that virtually every federal, state, municipal and local group with an interest in the project, with the exception of the named defendants, oppose the dumping at Site A.[28]

For the reasons stated in this opinion, the Corps of Engineers, their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them, including Bohemia, Inc., are enjoined and restrained from dumping any material on Site A until further Order of Court. The injunction takes effect on December 24, 1982 at 12:00 o'clock noon. The Clerk of Court is hereby directed to give the defendants telephonic notice of the terms of this injunction.

---

**28.** Significantly, the Ocean Dumping regulations require the federal defendants to give "full consideration" to such "nonquantifiable aspects" as "[r]esponsible public concern for the consequences of the proposed dumping." 40 C.F.R. § 227.17(b)(1).